STATE of Tennessee, Appellee,

v.

Mack Edward BROWN, Appellant.

Supreme Court of Tennessee,
at Knoxville.

June 1, 1992.

Rehearing denied Aug. 3, 1992.

Randall E. Reagan, Leslie A. Nassios, Knoxville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, James W. Milam, Asst. Atty. Gen., Nashville, for appellee.

OPINION

DAUGHTREY, Justice.

This capital case arose from the death of four-year-old Eddie Eugene Brown and the subsequent conviction of his father for first-degree murder, as well as for child neglect.[1] After careful review, we have reached the conclusion that the evidence introduced at trial is not sufficient to support a conviction for first-degree murder. We therefore hold that the defendant's conviction must be reduced to second-degree murder.

### 1. Factual Background

The victim in this case, Eddie Eugene Brown, was born in early February 1982, the son of defendant Mack Edward Brown and his co-defendant, Evajean Bell Brown, who were not living together at the time of Eddie's birth and were later divorced. Evajean was not able to nurse Eddie immediately after his birth because she was hospitalized with hypotoxemia.

According to his pediatrician, this hospitalization and inability to nurse may have contributed to Eddie's being, as the doctor described him, a "failure to thrive baby." When the physician first saw Eddie on March 17, 1982, at a little more than five weeks old, the infant was in good health but smaller than the median for his age. Mack and Evajean were still separated at that time, and relations between them eventually worsened to the point that Evajean asked the pediatrician to change Eddie's name on his records to Justin Michael Brown. Because Eddie had not begun to talk by age two-and-a-half, he was referred to the University of Tennessee Speech and Hearing Clinic. The clinic's report indicates that by age three years and four months, he was not yet toilet-trained and could speak single words, but not whole sentences. Evajean brought Eddie to see his pediatrician on November 5, 1984, because, as the doctor testified, she said he had fallen down fifteen carpeted stairs the night before. Although the physician found no injuries consistent with such a fall, he did note that Eddie's penis was red, swollen, and tender to the touch. His medical records do not give a reason for this condition. Eddie's last visit to his pediatrician's office was on October 16, 1985,

1. Eddie's mother was charged as well, but her trial ended in a mistrial and because of double jeopardy considerations, she cannot be retried. See section 4, *infra*.

with his mother and father, who by that time had reconciled.

According to a Department of Human Services social worker who had investigated the Brown home, Eddie was a hyperactive child with a severe speech problem. She reported that he also had severe emotional and behavioral problems. As an example of his behavior, she reported that during her visit, he ran down the hall directly into a wall.

Defendant Mack Brown's relationship with Evajean Brown appears to have been influenced by his dependent personality, a condition confirmed by the diagnoses of the staff of the Middle Tennessee Mental Health Institute and the Helen Ross McNabb Center. In describing Mack and Evajean's relationship, Mack's mother stated that he appeared to do everything Evajean wanted him to do and that he seemed to be afraid of her. A witness who visited them when Eddie was taken to the hospital on April 10, 1986, indicated that they sat close to one another holding hands and that whenever Evajean got up, he followed her. Mack's mother testified that they remarried in the summer of 1985.

Mack had been living with his wife and his son for less than a year when Eddie died. The Brown's next-door neighbor testified that, at around 3:40 a.m. on April 10, 1986, she heard yelling and screaming in their apartment. She distinctly heard a man's voice say, "Shut up. Get your ass over here. Sit down. Shut up. I know what I'm doing." She also heard a woman's voice say, "Stop, don't do that. Leave me alone. Stop don't do that." She testified that the fight went on for 30 minutes and that she heard a sound which she described as a "thump, like something heavy hit the wall." The only other evidence introduced concerning the events of that morning was the tape of Evajean's call for an ambulance. At 8:59 a.m. she telephoned

for help for her son, stating that he "fell down some steps and he's not breathing."

The paramedics who answered the call tried to revive Eddie but were unsuccessful. His heartbeat was reestablished at the hospital, but as it turned out, he was already clinically brain-dead. One of the treating nurses later testified that at that point, Eddie was being kept alive only for purposes of potential organ donation.

Various examinations indicated that the child had suffered two, and possibly three, skull fractures. The CT scan revealed a hairline fracture in the front right temporal portion of his skull, as well as a blood clot and swelling in that area of the head. The scan also revealed the possibility of a second fracture in the middle of the frontal bone.[2] Finally, blood coming from Eddie's ear indicated that he had a fracture at the base of his skull which had caused an injury to the middle ear. Although no basiliar skull fracture appeared on the X-rays or CT scan of Eddie's skull, expert testimony established that such fractures generally are not revealed in these ways.

The CT scan showed a cerebral edema, or swelling of the brain, which was more pronounced on the right side of the brain than the left, and which had shifted the midline of Eddie's brain toward the left. The pathologist who performed the autopsy noted the presence of vomit in Eddie's lungs and explained that swelling in the brain can cause vomiting. He theorized that repeated blows to Eddie's head caused cerebral hemorrhages and swelling. According to the expert, this pressure in the skull resulted in Eddie's aspiration of his own vomit and his ultimate death. He testified further that the swelling process could have taken as long as four or five hours to a day, or as little as 15 minutes.[3]

A neurological surgeon testified that Eddie's brain injuries were, at least in part,

2. There is some question as to whether this was actually a fracture or simple growth plates in the skull which had failed to join, making the normal suture resemble a fracture.

3. The significance of this testimony is that the child could have sustained these injuries at 4 a.m. (when a neighbor heard the fight between his parents) and not have begun the process of vomiting and dying until just before the ambulance was called at 9 a.m.

consistent with contrecoup[4] injuries, which occur when the head is violently shaken back and forth. The surgeon explained that there is a limited amount of fluid between the brain and the skull. That fluid generally serves as a shock absorber, but when the skull and brain are moving at a sufficient velocity and the skull suddenly stops, the fluid is not an adequate buffer between the delicate brain tissue and the hard skull surface. As he described this phenomenon at trial, "when the skull stops the brain slaps up against it," resulting in severe bruising and swelling of the brain.

In addition to his cranial and cerebral injuries, Eddie had several internal injuries. When Eddie's internal organs were removed for donation, the county medical examiner observed hemorrhaging in the duodenum section of his intestine. He testified that such localized hemorrhaging was consistent with a blow by a fist to the upper portion of the abdomen. Additionally, blood was found in the child's stool and urine, and his liver enzymes were elevated. There was testimony to the effect that these conditions may have resulted from cardiac arrest, but that they are also consistent with blows to the abdomen, liver, and kidneys.

Finally, Eddie had bruises of varying ages on his face, scalp, ears, neck, chest, hips, legs, arms, buttocks, and scrotum. He had a large abrasion on his shoulder, scratches on his neck and face, and a round, partially healed wound on his big toe which, according to one of his treating nurses, was consistent with a cigarette burn.[5] He had lacerations on both his ears at the scalp. He had linear bruises consistent with being struck with a straight object. The autopsy revealed an old lesion at the base of his brain which was evidence of a head injury at least two weeks before his death. X-rays revealed a broken arm which had not been treated and which had occurred three to five weeks before his death. The injury to his arm was con-

firmed by a witness who had noticed his arm hanging limply and then later noticed it in a homemade sling.

The defendant's statement to the police verified the fact that Eddie's broken arm was never properly treated, but Mack Brown also told them that he had tried to help Eddie by making a splint for his arm himself. He explained that he did not take Eddie for medical treatment because he was terrified that no one would believe that he and his wife had not inflicted this injury on the child. He could not explain the old bruises on Eddie's body. He stated that although sometimes they disciplined Eddie by spanking him, they did attempt to discipline him in, as he described it, "alternative ways" such as sending him to his room to let him know that they were upset and wanted him to mind.

Brown's statement indicates that around two or three o'clock on the morning of April 10, 1986, he and his wife both spanked Eddie because Eddie had urinated and defecated on the floor. The defendant admitted to another spanking, after he had sent Eddie to bed, and after he and his wife had a fight over money. As the defendant described it, it was during this spanking that his "mood began to kind of snap and let go." He said that he remembered going to Eddie's bedroom and remembered ordering Evajean out of the room. Although he denied remembering anything other than spanking Eddie's bottom with the open part of his hand, he stated that he was afraid he had beaten Eddie during the time that everything "went blank." The only thing he clearly recalled before that point was Eddie "staring at [him] mean" and saying, "I hate you! I hate you!" He stated that his next memory was of going downstairs and hearing Eddie behind him, falling onto the landing and into the door.

When the police questioned the defendant, his right hand was badly swollen. He explained that several days prior to

---

**4.** The neurological surgeon testified that "contrecoup" is French for "back and forth."

**5.** There was testimony that Mack Brown smoked cigarettes but Evajean Brown did not.

The nurse who characterized this wound as a cigarette burn did not make a notation to this effect in Eddie's chart. For further discussion on this point, see section 8, *infra.*

April 10, he had injured his hand while working on his car and had sought medical treatment at Fort Sanders Hospital. They put a splint on his hand and gave him pain medication. He denied having struck Eddie with his right hand, stating that "[i]t hurts so bad there ain't no way." The hospital's records indicate that on April 3, the defendant's hand was x-rayed and splinted. The records do not indicate that there was any break in the skin on the hand.

With the consent of the defendant, the police searched the apartment and recovered numerous items stained with blood consistent with Eddie's blood type, including an adult pajama top, a brown paper bag from the living room floor, and several towels and wash cloths. Police also found a bandage under the kitchen sink which was stained with blood consistent with Eddie's blood type. The blood on this bandage material was on the outside near the adhesive tape, not on the inner surface, which would have been next to the skin of the person wearing the bandage. The pants the defendant was wearing at the time of his arrest also had blood stains on them that were consistent with Eddie's blood type. A number of other items collected from the apartment tested positive for human blood, but the type of blood could not be determined because there was too little blood or they had been washed. These items included the couch cover, a pillow case and sheets taken from Eddie's bed, paint chips from the wall in Eddie's room, a child's undershirt and socks, and a three-by-five inch section of the living room rug.

The defendant's low level of intellectual functioning has been evident in nearly every phase of his life. His mother's testimony indicated that, as a baby, he was slow in learning to walk, a condition she blamed on head injuries he might have sustained when he was delivered using forceps. At age 12, he was considered by school officials to be educably mentally retarded. His school records for 1964 indicate an IQ of 55, using a Lorge–Thorndike test. In 1966, while 14 years old and still in the third grade, he was tested again. His verbal score was 56 and his non-verbal score was 75, for a total score of 62. In 1968, his verbal score was 53 and his non-verbal score was 76, for a total score of 60. After his arrest, he was evaluated at Middle Tennessee Mental Health Institute and scored 75 on the Wexler Adult Intelligence Test. Because there was some evidence that the defendant might be malingering, the clinical psychologist who performed the test at MTMHI testified that he felt that the test results did not reflect the defendant's true abilities and suggested that a rough estimate of his capabilities might be five to ten points higher.[6]

The defendant also has a documented history of mental and emotional problems. On a neighbor's recommendation, he sought help through the Helen Ross McNabb Center between the time of his divorce and his remarriage. The staff there diagnosed him as having recurrent major depression and a dependent personality, a condition characterized by inadequacy in decision-making and a tendency to allow another person to accept the major responsibilities for his life. At that time, he showed symptoms such as crying, appetite loss, sleep problems and numbness, tingling and headaches, among other things. He had made suicidal gestures but never a serious attempt on his own life.

After his arrest he was placed at the Middle Tennessee Mental Health Institute for observation from June 10 through July 29, 1986. While there he was diagnosed as having a dysthymic disorder, that is, a depressive neurosis, and a dependent personality. Experts at MTMHI concluded that he was not psychotic and that although he did have a significant personality disorder and was probably borderline mentally retarded, the degree of his retardation was not sufficient to establish an insanity defense. This diagnosis was confirmed during the defendant's second visit to MTMHI from April 4 through May 6, 1988, for a competency evaluation. The staff reiterated that the defendant's handicapping

---

**6.** For further discussion of the defendant's IQ scores, see section 15, *infra.*

feature is his low intellect. These findings were also confirmed by the staff of the Helen Ross McNabb Center, which provided follow-up care to the defendant after his release from MTMHI.

### 2. Sufficiency of the Evidence

We are asked first to decide whether the evidence was sufficient to support the verdict of first-degree murder. The defendant argues principally that premeditation was not shown. He also contends that adequate weight was not given to the fact that another adult (Eddie's mother) was in the home and that Eddie had sustained injuries in the past while she had sole custody of him. Further, the defendant questions whether the state carried its burden of proving his sanity.

Our consideration of the sufficiency of the evidence is governed by the "well-settled rule that all conflicts in testimony, upon a conviction in the trial court, are resolved in favor of the State, and that upon appeal the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Nevertheless, the record must demonstrate that the state carried its burden at trial of establishing that the homicide in question was, indeed, first-degree murder. In this case, we conclude, the prosecution failed to discharge its burden.

Addressing the least complex of the defendant's allegations first, we note that the question of relative criminal responsibility for the victim's death, as between Mack Brown and Evajean Brown, was essentially one of credibility for the jury's determination. We find no basis to disturb the jury's determination in this regard.

■ We also conclude that the state carried its burden on the issue of the defendant's sanity. The defense expert who reviewed the defendant's history and attempted to interview him concluded that the defendant met the criteria for the insanity defense in Tennessee because he was suffering from depression with psy-

chotic features. Although the state's psychological experts conceded that the defendant was chronically depressive and might be mentally retarded, they concluded unequivocally that his condition did not rise to the level of insanity, under the standards of *Graham v. State,* 547 S.W.2d 531, 543 (Tenn.1977). This conflict in testimony must be resolved in favor of the state's theory, based on the jury's verdict of guilt as approved by the trial judge. *See State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn. 1978).

■ But even though the defendant failed to establish insanity as an absolute defense to homicide in this case, his mental state was nevertheless relevant to the charge of first-degree murder, to the extent that it related to the necessary elements of that offense. The statute in effect at the time of the homicide in this case defined first-degree murder as follows:

> Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree.

T.C.A. § 39–2–202(a) (1982). Based upon our review of the record, we conclude that the evidence in this case is insufficient to establish deliberation and premeditation. Hence, the defendant's conviction for first-degree murder cannot stand. However, we do find the evidence sufficient to sustain a conviction of second-degree murder.

At common law, there were no degrees of murder, but the tendency to establish a subdivision by statute took root relatively early in the development of American law. The pattern was set by a 1794 Pennsylvania statute that identified the more heinous kinds of murder as murder in the first degree, with all other murders deemed to be murder in the second degree. Some states have subdivided the offense into three or even four degrees of murder, but

since the enactment of the first such statute in 1829, Tennessee has maintained the distinction at two.[7] It is one which this Court has found to be "not only founded in mercy and humanity, but ... well fortified by reason."[8] *Poole v. State*, 61 Tenn. 289, 290 (1872).

From the beginning, the statutory definition of first-degree murder required the state to prove that "the killing [was] done *willfully*, that is, of purpose, with intent that the act by which the life of a party is taken should have that effect; *deliberately*, that is, with cool purpose; *maliciously*, that is, with malice aforethought; and *with premeditation*, that is, a design must be formed to kill, before the act, by which the death is produced, is performed." *Dale v. State*, 18 Tenn. (10 Yer.) 551, 552 (1837) (emphasis added). Because conviction of second-degree murder also requires proof of intent and malice, the two distinctive elements of first-degree murder are deliberation and premeditation.

Even as early as 1872, however, prosecutors and judges had apparently fallen into the error of commingling these two elements by using the terms interchangeably. In *Poole v. State, supra*, for example, Justice Turney expounded upon the statutory distinction between deliberation and premeditation and the need to maintain them as separate elements of the first-degree murder:

It is the defining words of the statute that make the offenses [of first- and second-degree murder] and distinctions between them, definitions and distinctions in the control of the Legislature—control it has exercised, and the Courts are bound by it.

It is too late, after the words of the Act have been so long, uniformly and plainly construed, to attempt to make any two of its words have the same meaning—a

meaning of equally forcible import—so as to excuse or do away with the employment of one in an indictment for murder in the first degree....

[As we noted in *Dale v. State*] '... proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the conquering will, deliberation and premeditation of the party accused sought,' making *a marked distinction and independence between the terms 'deliberation' and 'premeditation' and excluding the idea of the substitution of the one for the other, or of the tautology in their use.*

*Id.* 61 Tenn. at 290–92 (emphasis added).

In *Poole*, the issue was whether the indictment, which was drawn in the language of common-law murder, was sufficient to charge statutory first-degree murder, given the fact that it included "no word or sentence charging a cool purpose, [deliberation being] an indispensable ingredient in murder in the first degree." *Id.* at 293. As Justice Turney noted, "[w]illfulness, malice and premeditation may exist without that cool purpose contemplated by the statute as construed," *id.*, and if so, the result is second-degree murder, not first.

Intent to kill had long been the hallmark of common-law murder, and in distinguishing manslaughter from murder on the basis of intent, the courts recognized, in the words of an early Tennessee Supreme Court decision, that

[t]he law knows of no specific time within which an intent to kill must be formed so as to make it murder [rather than manslaughter]. If the will accompanies the act, a moment antecedent to the act itself which causes death, it seems to be as completely sufficient to make the offence murder, as if it were a day or any other time.

---

7. Acts 1829, Ch. 23, § 3 provides in pertinent part: "All murder which shall be perpetrated by means of poison, lying in wait or by any other kind of willful, deliberate, malicious, and premeditated killing, or which shall be committed in the perpetration of or attempt to perpetrate any arson, rape, robbery, burglary or larceny, *shall* be deemed murder in the first degree, and

all other kinds of murder shall be deemed murder in the second degree."

8. At common law and in Tennessee prior to 1829, the only penalty provided for murder was death; the creation of second-degree murder introduced the possibility of a life sentence upon conviction.

*Anderson v. State*, 2 Tenn. (2 Overt.) 6, 9 (1804). Of course, the *Anderson* opinion predates the statutory subdivision of murder into first and second degrees. But the temporal concept initially associated in that case with intent, *i.e.*, that no definite period of time is required for the formation of intent, was eventually carried over and applied to the analysis of premeditation. Hence, by the time the opinion in *Lewis v. State* was announced in 1859, the Court had begun the process of commingling the concepts of intent, premeditation, and deliberation, as the following excerpt demonstrates:

> The distinctive characteristic of murder in the first degree, is *premeditation.* This element is superadded, by the statute, to the common law definition of murder. Premeditation involves a previously formed design, or actual *intention* to kill. But such design, or intention, may be conceived, and *deliberately* formed, in an instant. It is not necessary that it should have been conceived, or have preexisted in the mind, any definite period of time anterior to its execution. It is sufficient that it preceded the assault, however short the interval. The length of time is not of the essence of this constituent of the offense. The purpose to kill is no less premeditated, in the legal sense of the term, if it were deliberately formed but a moment preceding the act by which the death is produced, than if it had been formed an hour before.

40 Tenn. (3 Head) 127, 147–48 (1859) (emphasis added).

It is this language ("premeditation may be formed in an instant") for which *Lewis* is frequently cited. *See, e.g., Turner v. State*, 119 Tenn. 663, 108 S.W. 1139, 1142 (1908). What is often overlooked is the following language, also taken from *Lewis:*

> The mental state of the assailant at the moment, rather than the length of time the act may have been premeditated, is the material point to be considered. *The mental process, in the formation of the purpose to kill, may have been instantaneous, and the question of vital importance is—was the mind, at that moment, so far free from the influence of* excitement, or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose; *and was the death of the person assaulted, the object to be accomplished—the end determined upon.

*Lewis,* 40 Tenn. at 148 (emphasis added).

■ Hence, perhaps the two most oft-repeated propositions with regard to the law of first-degree murder, that the essential ingredient of first-degree murder is premeditation and that premeditation may be formed in an instant, are only partially accurate, because they are rarely quoted in context. In order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection. As noted in *Rader v. State*, 73 Tenn. 610, 619–20 (1880):

> When the murder is not committed in the perpetration of, or attempt to perpetrate any of the felonies named in the [statute], then, in order to constitute murder in the first degree, it must be perpetrated by poison or lying in wait, or some other kind of willful, deliberate, malicious, and premeditated killing; that is to say, *the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain.* Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required. It is true it has been held several times that the purpose need not be deliberated upon any particular length of time—it is enough if it precede the act, but in all such cases the purpose must be coolly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside.... [I]f the purpose to kill is formed in passion ..., and executed

without time for the passion to cool, it is not murder in the first degree, but murder in the second degree.

(Emphasis added.)

The obvious point to be drawn from this discussion is that even if intent (or "purpose to kill") and premeditation ("design") may be formed in an instant, deliberation requires some period of reflection, during which the mind is "free from the influence of excitement, or passion." *Clarke v. State*, 218 Tenn. 259, 402 S.W.2d 863, 868 (1966).

Despite admonitions in the opinions of the Tennessee Supreme Court during the nineteenth century and early part of the twentieth century regarding the necessity of maintaining a clear line of demarcation between first- and second-degree murder,[9] that line has been substantially blurred in later cases. The culprit appears to be the shortcutting of analysis, commonly along three or four different tracks.

One of those has been the same error decried by Justice Turney in 1872, *i.e.*, the use of the terms "premeditation" and "deliberation" interchangeably, or sometimes collectively, to refer to the same concept. Thus, in *Sikes v. State*, 524 S.W.2d 483, 485 (Tenn.1975), the Court said: "Deliberation and premeditation involve a prior intention or design on the part of the defendant to kill, however short the interval between the plan and its execution." While this statement focuses on premeditation, nowhere in the brief discussion that follows is there any reference to the coolness of purpose or reflection that is required under the older cases to establish deliberation as a separate and distinct element of first-degree murder. But if deliberation was given little attention in *Sikes*, it was not even discussed in *State v. Martin*, 702 S.W.2d 560 (Tenn.1985), perhaps because the litigants failed to raise the issue. In *Martin*, the Court confined its first-degree murder analysis to the elements of premeditation,

willfulness, and malice, even though the theory of defense suggests that lack of proof of deliberation was equally relevant to the discussion. *Id.* at 562–63.

Another weakness in our more recent opinions is the tendency to overemphasize the speed with which premeditation may be formed. The cases convert the proposition that no *specific* amount of time between the formation of the design to kill and its execution is required to prove first-degree murder, into one that requires virtually no time lapse at all, overlooking the fact that while intent (and perhaps even premeditation) may indeed arise instantaneously, the very nature of deliberation requires time to reflect, a lack of impulse, and, as the older cases had held at least since 1837, a "cool purpose." *Dale v. State, supra*, 18 Tenn. at 552.

This trend toward a confusion of premeditation and deliberation has not been unique to Tennessee. It was for a time reflected by the commentators. In *Clarke v. State, supra*, 402 S.W.2d at 868, the Court quoted from the 1957 edition of Wharton's Criminal Law and Procedure as follows:

"Deliberation and premeditation involve a prior intention or design to do the act in question. It is not necessary, however, that this intention should have been conceived at any particular period of time, and it is sufficient that only a moment elapsed between the plan and its execution...."

A more recent version of Wharton's Criminal Law, however, returns the discussion of premeditation and deliberation to its roots:

Although an intent to kill, without more, may support a prosecution for common law murder, such a murder ordinarily constitutes murder in the first degree only if the intent to kill is accompanied by premeditation and deliberation. 'Pre-

---

9. *See, e.g., Winton v. State*, 151 Tenn. 177, 268 S.W. 633, 638 (1924), in which the Court noted: "The distinction between the two degrees of murder is well defined by our statutes, and the decisions of this court. If those charged with the enforcement of the criminal laws would not insist upon convictions for first-degree murder when the facts do not justify it, the result would be more affirmances in this court, and the trouble and expense of new trials would, in many instances, be avoided."

meditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and *'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. 'Deliberation' is present if the thinking, i.e., the 'premeditation,' is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a 'careful weighing' of the proposed decision.*

C. Torcia, *Wharton's Criminal Law* § 140 (14th ed. 1979) (emphasis added).

To the same effect is this analysis of the distinction between first- and second-degree murder found in 2 W. LaFave and A. Scott, *Substantive Criminal Law* § 7.7 (1986):

Almost all American jurisdictions which divide murder into degrees include the following two murder situations in the category of first-degree murder: (1) intent-to-kill murder where there exists (in addition to the intent to kill) the elements of premeditation and deliberation, and (2) felony murder where the felony in question is one of five or six listed felonies, generally including rape, robbery, kidnapping, arson and burglary. Some states instead or in addition have other kinds of first-degree murder.

(a) Premeditated, Deliberate, Intentional Killing. To be guilty of this form of first-degree murder the defendant must not only intend to kill but in addition he must premeditate the killing and deliberate about it. It is not easy to give a meaningful definition of the words 'premeditate' and 'deliberate' as they are used in connection with first-degree murder. Perhaps the best that can be said of 'deliberation' is that it requires a cool mind that is capable of reflection, and of 'premeditation' that it requires that the one with the cool mind did in fact reflect, at least for a short period of time before his act of killing.

It is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' and convictions for first-degree murder have frequently been affirmed where such short periods of time were involved. *The better view, however, is that to 'speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, ... destroys the statutory distinction between first and second-degree murder,'* and (in much the same fashion that the felony-murder rule is being increasingly limited) this view is growing in popularity. This is not to say, however, that premeditation and deliberation cannot exist when the act of killing follows immediately after the formation of the intent. The intention may be finally formed only as a conclusion of prior premeditation and deliberation, while in other cases the intention may be formed without prior thought so that premeditation and deliberation occurs only with the passage of additional time for 'further thought, and a turning over in the mind.' (Footnotes omitted; emphasis added.)

One further development in Tennessee law has tended to blur the distinction between the essential elements of first- and second-degree murder, and that is the matter of evidence of "repeated blows" being used as circumstantial evidence of premeditation. Obviously, there may be legitimate first-degree murder cases in which there is no direct evidence of the perpetrator's state of mind. Since that state of mind is crucial to the establishment of the elements of the offense, the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence. Relevant circumstances recognized by other courts around the country have included the fact "that a deadly weapon was used upon an unarmed victim; that the homicidal act was part of a conspiracy to kill persons of a particular class; that the killing was particularly cruel; that weapons with which to commit the homicide were procured; that the defendant made declarations of his intent to kill the victim; or that preparations were made

before the homicide for concealment of the crime, as by the digging of a grave." *Wharton's Criminal Law, supra,* at § 140. This list, although obviously not intended to be exclusive, is notable for the omission of "repeated blows" as circumstantial evidence of premeditation or deliberation.

In Tennessee, the use of repeated blows to establish the premeditation necessary to first-degree murder apparently traces to *Bass v. State,* 191 Tenn. 259, 231 S.W.2d 707 (1950). There the Court, after noting that "[b]oth premeditation and deliberation may be inferred from the circumstances of a homicide," *id.,* 231 S.W.2d at 711, went on to list a series of facts from which the Court concluded that the victim's death constituted first-degree murder. The first (but not the only) such circumstance mentioned was that "the deceased was not only struck and killed by a blow from an iron poker but apparently from the number and nature of his wounds, was beaten to death by a whole series of blows." *Id.* While the *Bass* court did not interpret the fact of repeated blows to be sufficient, in and of itself, to constitute premeditation and deliberation, subsequent cases have done so. In *Houston v. State,* for example, the only circumstance relied upon by the majority to establish premeditation and deliberation was the fact that the victim had sustained "repeated shots or blows." 593 S.W.2d 267, 273 (Tenn.1980).

The culmination of this development is probably best represented by the analysis in *State v. Martin, supra,* 702 S.W.2d at 563, where the Court said:

Repeated blows or shots may support an inference of premeditation. *See Houston v. State,* 593 S.W.2d 267, 273 (Tenn. 1980). It is also possible that the jury could have found that during the struggle [with the victim] appellant decided to kill the victim, only a moment of time being required between the plan to kill and its execution. *Clarke v. State,* 218 Tenn. 259, 402 S.W.2d 863, 868 (1966).

Logically, of course, the fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder. Repeated blows can be delivered in the heat of passion, with no design or reflection. Only if such blows are inflicted as the result of premeditation and deliberation can they be said to prove first-degree murder.

In bringing three of the previously discussed threads together—recognition of "repeated blows" as sufficient evidence of premeditation, invocation of the rule that "premeditation can be formed in an instant," and omission of any discussion of deliberation as a necessary element of murder in the first degree—the *Martin* decision represents a substantial departure from the traditional law of homicide. It also undercuts older Tennessee cases such as *Rader v. State, supra,* 73 Tenn. at 620, which emphasized that intent to kill, if formed during a deadly struggle, would support only a conviction for second-degree murder, *unless* the state could show that premeditation and deliberation had preceded the struggle.

Since the opinion in *Martin,* the Tennessee General Assembly has rewritten the state's homicide statute. In addition to certain felony-murder provisions, T.C.A. § 39–13–202(a)(1) defines first-degree murder as "[a]n intentional, premeditated and deliberate killing of another." The *mens rea* elements of deliberation and premeditation have been further emphasized by the inclusion of definitional sections in T.C.A. § 39–13–201(b), as follows:

(1) "Deliberate act" means one performed with a cool purpose; and

(2) "Premeditated act" means one done after the exercise of reflection and judgment. Premeditation may include instances of homicide committed by poison or by lying in wait.

Without commenting on the validity of the result we reached in *Martin v. State,* we can only conclude that the legislature's enactment of the provisions set out above should have the effect of steering the courts back onto the right track in their analysis of the law of homicide. And although the 1989 legislation predates the offense in this case, we believe it is worth emphasis here, because it clearly repre-

sents the legislature's intent that the courts of Tennessee should adhere to long-established rules of law and that we should abandon the modern tendency to muddle the line between first- and second-degree murder. Certainly, more than the mere fact of "repeated blows" must be shown to establish first-degree murder, and to the extent that the opinions in *Houston* and *Martin* can be read to hold otherwise, they are expressly overruled.

Moreover, even though the Sentencing Commission Comments to T.C.A. § 39-13-201 indicate that the definition in subsection (b)(2) "permits that 'premeditation may be formed in an instant,'" citing *Taylor v. State*, 506 S.W.2d 175 (Tenn.Crim. App.1973), we think it is time to recognize, as Justice Brock argued in *Everett v. State*, that "[m]ore than a split-second intention to kill is required to constitute premeditation," which "by its very nature is not instantaneous, but requires *some* time interval." 528 S.W.2d 25, 28–29 (Tenn. 1975) (Brock, J., dissenting; emphasis in original).

It is consistent with the murder statute and with case law in Tennessee to instruct the jury in a first-degree murder case that no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan, but we conclude that it is prudent to abandon an instruction that tells the jury that "premeditation may be formed in an instant." Such an instruction can only result in confusion, given the fact that the jury must also be charged on the law of deliberation. If it was not clear from the opinions emanating from this Court within the last half-century, it is now abundantly clear that the deliberation necessary to establish first-degree murder *cannot* be formed in an instant. It requires proof, as the Sentencing Commission Comment to § 39-13-201(b) further provides, that the homicide was "committed with 'a cool purpose' and without passion

or provocation," which would reduce the offense either to second-degree murder or to manslaughter, respectively.

This discussion leads us inevitably to the conclusion that Mack Brown's conviction for first-degree murder in this case cannot be sustained. The law in Tennessee has long recognized that once the homicide has been established, it is presumed to be murder in the second degree. *Witt v. State*, 46 Tenn. (6 Cold.) 5, 8 (1868). The state bears the burden of proof on the issue of premeditation and deliberation sufficient to elevate the offense to first-degree murder. *Bailey v. State*, 479 S.W.2d 829, 833 (Tenn.Crim.App.1972).

Here, there simply is no evidence in the record that in causing his son's death, Mack Brown acted with the premeditation and deliberation required to establish first-degree murder. There is proof, circumstantial in nature, that the defendant acted maliciously toward the child, in the heat of passion or anger,[10] and without adequate provocation—all of which would make him guilty of second-degree murder. The only possible legal basis upon which the state might argue that a first-degree conviction can be upheld in this case is the proof in the record that the victim had sustained "repeated blows." It was on this basis, and virtually no other, that we upheld a similar first-degree murder conviction for the death of a victim of prolonged child abuse in *State v. LaChance*, 524 S.W.2d 933 (Tenn.1975). In view of our foregoing discussion concerning the shortcomings of such an analysis, we find it necessary to depart from much of the rationale underlying that decision.

In abandoning *LaChance*, we are following the lead of a sister state. In *Midgett v. State*, 729 S.W.2d 410 (Ark. 1987), the Arkansas Supreme Court was asked to affirm the first-degree murder conviction of a father who had killed his eight-year-old son by repeated blows of his fist. As was the case here, there was a shocking history of

---

**10.** "Passion" has been defined as "[a]ny of the emotions of the mind [reflecting] anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection." *Winton v.*

*State*, 151 Tenn. 177, 268 S.W. 633, 637 (1925), repeated in *State v. Bullington*, 532 S.W.2d 556, 560 (Tenn.1976).

physical abuse to the child, established both by eyewitness testimony and by proof of old bruises and healed fractures.

The Arkansas court faced a precedent much like *LaChance* in *Burnett v. State*, 287 Ark. 158, 697 S.W.2d 95 (1985). There the court had described the injuries sustained by the child victim and held, without more, that the "required mental state for first-degree murder can be inferred from the evidence of abuse, which is substantial." *Id.*, 697 S.W.2d at 98. In confessing error in *Burnett*, the *Midgett* court noted:

> The appellant argues, and we must agree, that in a case of child abuse of long duration the jury could well infer that the perpetrator comes not to expect death of the child from his action, but rather that the child will live so that the abuse may be administered again and again. Had the appellant planned his son's death, he could have accomplished it in a previous beating. . . .

> The evidence in this case supports only the conclusion that the appellant intended not to kill his son but to further abuse him or that his intent, if it was to kill the child, was developed in a drunken, heated, rage while disciplining the child. Neither of those supports a finding of premeditation or deliberation.

*Midgett*, 729 S.W.2d at 413–14.

The Arkansas court, in strengthening the requirements for proof of premeditation and deliberation in a first-degree murder case involving a victim of child abuse, found it necessary to overrule prior case law to the extent that it was inconsistent with the opinion in *Midgett*. We do the same here. Like the *Midgett* court, we do not condone the homicide in this case, or the sustained abuse of the defenseless victim, Eddie Brown. We simply hold that in order to sustain the defendant's conviction, the proof must conform to the statute. Because the state has failed to establish sufficient evidence of first-degree murder, we reduce the defendant's conviction to second-degree murder and remand the case for resentencing.

## 3. Motion to Suppress

The defendant filed a pretrial motion to suppress, in which he claimed that his initial statement to police was taken in violation of his *Miranda* rights and should therefore be held inadmissible. He also contended that because his subsequent statements to police (one given at his home and another at police headquarters) and his consent to search his apartment flowed from that initial statement, they must be considered the "fruit of the poisonous tree" and should likewise be suppressed.

At the suppression hearing, the proof showed that the defendant's first statement was obtained as a result of questioning by Officer Henry Wood at the East Tennessee Children's Hospital. Officer Wood arrived at the hospital at about 3:00 p.m. on April 10, 1986, the day of Eddie's admission to the hospital. He initially met Pam Self, a Department of Human Services social worker, who told him that the parents had brought the child in and that the doctors believed that the case involved child abuse. She described Eddie's injuries to him and told Wood that the doctors did not consider his injuries to be consistent with falling down a flight of stairs. Officer Wood then saw the child and was informed that he was brain-dead. He spoke first with Evajean Brown and then with Mack Brown. At approximately 3:30 p.m., Mack Brown gave a statement after being advised as follows:

> I want you to understand your rights. You have the right to remain silent; anything you say can be used against you in a court of law. You have the right for an attorney to be present. You can stop answering questions at any time.

Brown was not informed that he had the right to have counsel appointed if he could not afford to hire counsel himself. The warnings given were, therefore, not technically in conformity with the requirements of the *Miranda* rule.

Officer Wood testified that he had no grounds upon which to arrest Mack Brown until Brown admitted that he had hit his son during this first interview. The arrest

warrant indicates that Wood placed Brown under arrest at 4:00 p.m.

Subsequent to the interview at the hospital, Officer Wood transported the defendant to his apartment and obtained his consent to conduct a search. During the course of the search, the defendant responded to questions by the police, who recorded his statements on the same tape as his initial statement obtained at the hospital. Items seized during this search included a wire coat hanger, a phone receiver, a man's slacks, shirt, and tennis shoes, wash cloths, and pills later identified as the non-narcotic drug Motrin. The search took an hour and a half, after which the defendant was transported to the Sheriff's Department at about 6:00 p.m.

At about 6:30 p.m., the defendant was fully advised of his rights in accordance with *Miranda* and signed a waiver of his rights. In response to police questioning, the defendant gave a statement that concluded at 7:15 p.m. The only further police contact with the defendant that evening occurred when the police talked to him in order to complete arrest forms at approximately 9:00 p.m.

At 9:30 p.m., Officer Woods spoke with Evajean Brown again at her request. Evajean recanted her prior statement that Eddie had sustained his injuries from a fall down stairs and placed the blame for Eddie's injuries on Mack Brown. Officer Wood's affidavit in support of his request for a search warrant indicates that Evajean Brown told him she witnessed several episodes during which Mack Brown beat and kicked Eddie Brown during the evening of April 9 and the early morning of April 10. She told Officer Wood that these beatings took place both upstairs and downstairs in their apartment.

Based on Officer Wood's affidavit, a search warrant was issued on April 16 for the Browns' apartment. This affidavit contains information obtained from all stages of Officer Wood's investigation, including the statements of the social worker and of the Browns at the hospital, Officer Wood's earlier observations in the Browns' apartment, the statement given by the defendant at the Sheriff's office at 6:30 on April 10, and the statements made by Evajean Brown later that evening. During the course of the search conducted pursuant to this search warrant, the police seized some 31 items with varying degrees of relevance to the issues in dispute at trial.

The trial court suppressed the statements obtained from the defendant at the hospital and in his apartment, but held that the defendant's consent to the search of his apartment was voluntarily given and refused to suppress the evidence seized during that search. The court also held that the statement given at 6:30 p.m. on April 10 was admissible because it was voluntarily given after a proper administration of *Miranda* warnings and a waiver of rights. Further, the trial judge held the search warrant to be proper and suppressed only a few items, the seizure of which he held to have exceeded the scope of the warrant.

The defendant now argues that because the initial statement obtained at the hospital was taken without full *Miranda* warnings, all subsequent evidence was obtained as a result of this initial statement and should have been excluded under a "fruit of the poisonous tree" theory. The defendant cites *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), *United States v. Smith,* 730 F.2d 1052, 1056 (6th Cir.1984), and *State v. Carpenter,* 773 S.W.2d 1 (Tenn.Crim.App. 1989), as authority for this proposition.

The state argues in response that the failure by police to give the defendant adequate *Miranda* warnings prior to questioning him at the hospital may render the resulting statement inadmissible, but that the error by police has no effect on the validity of the defendant's subsequent consent to search or on the admissibility of his later statements to police. In this regard, the state relies on the United States Supreme Court's opinion in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), for the proposition that an error made by police officers in administering *Miranda* warnings does not require the suppression of a subsequent statement, if the record establishes that the statement is

"knowingly and voluntarily made." *Id.* 470 U.S. at 309, 105 S.Ct. at 1293.

█ We have reviewed the record of the suppression hearing carefully, and we conclude that the rule in *Elstad* is inapplicable to the facts in this case because there was no violation of *Miranda* with regard to the defendant's initial statement at the hospital.

The prosecution conceded from the outset that the warnings given to Mack Brown at the hospital were technically deficient. The assistant district attorney argued, however, that at the time he gave the statement, the defendant was not "in custody," as that term is used in *Miranda,* and that the warnings were therefore unnecessary. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (defining "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.")

The proof shows that when Officer Wood first questioned the defendant and his wife, he knew that hospital personnel suspected child abuse, and he knew that the victim was considered brain-dead as a result. Although the circumstances pointed to the Browns as the perpetrators of the abuse, Officer Wood testified that Mack Brown was not in custody at the time of the interview, and that there was not a sufficient basis upon which to detain or arrest him until he admitted hitting the child. Asked what he would have done if the defendant had not implicated himself in the initial interview, Officer Wood replied that he would have had to continue the investigation. Without the benefit of medical reports, other corroborating evidence of abuse, or an incriminating statement by one or both of the Browns, there simply was not sufficient evidence upon which to determine whether Mack Brown was a suspect, a witness, or neither. Once Brown did implicate himself, Officer Wood made a warrantless arrest. From that point forward, the defendant was clearly not free to leave; but prior to his 4:00 p.m. arrest, there is no objective evidence that he was "in custody."

Despite the prosecutor's argument that Brown was not subjected to custodial interrogation at the hospital and that the failure to give proper *Miranda* warnings was therefore immaterial, the trial judge ultimately ruled that the statement given at the hospital was not admissible. At the conclusion of the suppression hearing, the trial judge noted that "the defendant was, in effect, taken into custody some time around 4 o'clock," which was after the initial statement was made. After taking the motion to suppress under advisement, however, the trial judge ruled two days later that the statement was inadmissible because the investigation was "focused on the defendant" at the time it was made. In response to the prosecutor's attempt to point out that "focus is not the law in this state,"[11] the trial judge replied, "Well, I won't allow that first statement anyway." No other reason for suppression was offered.

█ In view of the trial judge's earlier finding that the defendant was not actually "in custody" until 4:00 p.m., after the statement at the hospital was given, we conclude that the court's ruling on the admissibility of that statement was erroneous. To the extent that the defendant made incriminating statements at his apartment a short time later, while he was in custody but had not yet had the benefit of proper *Miranda* warnings, those statements were properly suppressed by the trial judge. However, we cannot find from the record before us that there was any relationship between statements made by the defendant during the initial search of the apartment and the formal statement that he gave at police headquarters after executing a written waiver of his *Miranda* rights.

█ In *State v. Smith,* 834 S.W.2d 915 (Tenn.1992), we held that "after illegally

---

**11.** "Focus" was explicitly repudiated as a basis for determining whether a suspect is "in custody" for purposes of *Miranda* in *Beckwith v.* *United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976).

obtaining an incriminating statement from a defendant, [the state] must establish that [any] subsequent confession was given freely and voluntarily and that the constitutional right to be free from self-incrimination was not waived due solely to the psychological pressures resulting from giving the previous statement." *Id.* at 921. In this case, the state carried its burden as to the voluntariness of the last of Mack's three incriminating statements. We therefore conclude that his 6:30 p.m. statement was fully admissible.

Nor do we find any error in regard to the validity of the search of the Browns' apartment that was conducted by police on the afternoon of April 10. That search was based on consent obtained from the defendant.

 In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. *Liming v. State*, 220 Tenn. 371, 417 S.W.2d 769 (1967). In this case, the police obtained the defendant's verbal permission to search his home, and Brown signed a consent form that explicitly makes reference to his right to refuse to consent to a search. Without some further evidence relevant to the questions of voluntariness, we find no basis upon which to invalidate the resulting search or to suppress the evidence that was seized by police at that time.

 Finally, we agree with the trial court that the ensuing search warrant was properly issued. Sufficient evidence was presented from which the magistrate could determine that there was probable cause for believing that the items listed were actually located in the Browns' apartment. *See Hampton v. State*, 148 Tenn. 155, 252 S.W. 1007 (1923). The affidavit of Officer Wood, on which the magistrate determined that probable cause for the search existed, made reference to Officer Wood's personal observations of the victim's bleeding injuries and the blood oozing from his ear; his earlier observations of bed linens in the victim's room stained with what appears to be blood, as well as a sponge mop and dishpan of water in the living room; his

conversation with Mack Brown at 6:30 p.m. on April 10, in which the defendant admitted striking the victim and attempting to clean up blood; and his conversation with Evajean Brown, in which she stated that her husband beat Eddie both upstairs and downstairs on the night he died. The search warrant authorized a search for "blood stains and a mop, dishpan and water containing human blood ... located at Apartment 62, Cedar Springs Apartments." There were ample grounds, pursuant to T.C.A. §§ 40-6-101 *et seq.*, for the issuance of a search warrant to recover these items.

### 4. Discovery Dispute

The defendant challenges the trial court's order that counsel for Mack Brown and counsel for Evajean Brown could not share the information obtained from the state by the discovery motion filed by counsel for Evajean Brown pursuant to Rule 16 of Tennessee Rules of Criminal Procedure. Further, the defendant asserts that the trial court erred in prohibiting counsel for Mack Brown from viewing the information in the possession of counsel for Evajean Brown after all proceedings concerning her were complete.

Mack and Evajean Brown were jointly indicted but were represented by separate counsel. Counsel for Evajean Brown requested discovery from the state pursuant to Rule 16(a)(1)(C) and (D) of the Tennessee Rules of Criminal Procedure. This request triggered the state's right to reciprocal discovery. *Id.* However, counsel for Mack Brown did not request discovery under this rule. On April 14, 1987, the trial court entered a blanket order prohibiting counsel for Evajean Brown and counsel for Mack Brown from transferring any items between themselves that had been received from the state pursuant to the single Rule 16 discovery request filed on Evajean Brown's behalf. Counsel for Mack Brown filed his objection to the order on April 20, 1987.

Mack Brown's motion to sever, which was filed on April 30, 1987, was granted by order filed May 5, 1987. Evajean Brown's trial, which began on September 14, 1987,

**548**

ended in a mistrial. The Court of Criminal Appeals later held that Evajean Brown could not be retried because of double jeopardy principles. *State of Tennessee v. Evajean Brown,* (Tenn.Crim.App. Knoxville, Dec. 20, 1988), 1988 WL 136600, perm. app. denied, May 8, 1989.

After these events, counsel for Mack Brown moved the trial court to rescind the order of April 14, 1987, but the trial court refused to allow counsel for Mack Brown to receive any information from Evajean Brown's counsel that had originated with the state, unless Mack Brown consented to reciprocal discovery by the state. Counsel for Mack Brown did not request that the information in question be reviewed by the trial court or submitted under seal for appellate review.

The state insists that the defendant improperly attempted to gain the benefit of Evajean Brown's full discovery motion while denying the state the reciprocal discovery to which it would have been entitled had he filed for Rule 16 discovery himself. We conclude that the prosecution has overstated the case to some extent. Trial courts, to be sure, have the discretion to enter orders necessary to insure compliance with Rule 16. *Cf. State v. Bell,* 690 S.W.2d 879 (Tenn.Crim.App.1985); *State v. Vilvarajah,* 735 S.W.2d 837 (Tenn.Crim. App.1987). However, to do so, reciprocal discovery must have already been triggered. *Id.* In this case, because the disclosure of items in the possession of counsel for Evajean Brown would not necessarily have triggered reciprocal discovery as to Mack Brown, the trial court's order should have been more selective with regard to disclosure.

Reciprocal discovery would only have been triggered if, by the disclosure of the items held by counsel for Evajean Brown, Mack Brown had gained access to information he could have gotten by filing his own request for full Rule 16 discovery. But, Evajean Brown's request would only result in discovery by her of items which were material to the preparation of her own defense, intended for use by the state in its case in chief against her, or obtained from

or belonging to her. T.R.Crim.P. Rule 16(a)(1)(C). Hence, items subject to full Rule 16 discovery by Mack Brown would not necessarily have been subject to discovery by Evajean Brown. Obviously, disclosure of Evajean Brown's holdings would not have equated with full Rule 16 discovery by Mack Brown.

The importance of unrestricted discovery in preparation for trial is obvious. Indeed, a prosecutor's failure to comply with discovery can contribute to a finding of reversible error. *State v. Benson,* 645 S.W.2d 423 (Tenn.Crim.App.1983). However, the burden rests on the defense to show the degree to which the impediments to discovery hindered trial preparation and defense at trial. Because of the failure of defense counsel to include the materials they sought from counsel for Evajean Brown in the record, we have no way of determining whether access to these materials would have had an impact on the outcome of the trial. Without this determination, we cannot find reversible error.

### 5. Motion for a Morgan Hearing

The defendant insists that the trial court erred in denying the defendant's motion for a hearing pursuant to *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976). At the time of trial in this case, the decision to hold such a hearing rested solely in the discretion of the trial court. *State v. Martin,* 642 S.W.2d 720 (Tenn.1982). In view of the fact that there was no indication that the defendant would testify or that he might have prior convictions that could be used to impeach his testimony, we find no abuse of discretion in the trial court's decision not to hold a *Morgan* hearing.

### 6. Amendment of the Indictment

The defendant next argues that his right to a fair trial was violated when the trial judge granted the state's motion to remove the word "intentionally" from the first-degree murder count returned against him. In view of the fact that we have reversed the defendant's conviction on this count, we hold that the question has been rendered moot.

### 7. Jury Selection

The defendant questions the excusal for cause or the failure to allow such an excusal for cause of several prospective jurors. These arguments are based on two points: the jurors' exposure to publicity about the case and the jurors' statements when questioned about their ability to follow the law as it relates to the imposition of the death penalty. Because the validity of the death penalty is no longer at issue in this case, the latter point is moot.

 Moreover, we have reviewed the record of the selection of this jury and find no error with regard to the first point. Jurors need not be totally ignorant of the facts of the case on which they sit, and may sit on a case even if they have formed an opinion on the merits of the case, *if* they are able to set aside that opinion and render a verdict based on the evidence presented in court. *State v. Sammons,* 656 S.W.2d 862, 869 (Tenn.Crim.App.1982). This determination of impartiality is a matter for the discretion of the trial judge. *Id.*

### 8. Opinion Testimony

The defendant asserts that the trial court erred in allowing certain witnesses to testify outside the scope of their knowledge or expertise. Essentially, the defendant argues that witnesses not properly qualified as experts were allowed to testify as to their opinions in violation of the long-standing principles set forth in *Cumberland Telegraph & Telephone Co. v. Dooley,* 110 Tenn. 104, 72 S.W. 457 (1903), and formalized in Rule 701 of the Tennessee Rules of Evidence. Further, the defendant argues that otherwise properly qualified expert witnesses were improperly allowed to testify outside the area of expertise in which they had been qualified to testify. *See State v. Wright,* 756 S.W.2d 669 (Tenn. 1988).

 The defendant takes issue specifically with the testimony of Leon Miller (the paramedic who attempted to resuscitate Eddie) about the cause of bruises around Eddie's eyes and the length of time it would take for these bruises to develop. Miller identified Exhibit #2 as being a photograph of the child whom he attempted to revive. He then voluntarily stated that the photograph did not show the child's "coon eyes" as distinctly as they appeared when he treated him. He managed to testify that bruising around the eyes is indicative of skull trauma before defense counsel objected to his testimony. The trial court overruled this objection, as well as defense counsel's later objection to Miller's testimony that he understood that such bruising could take two to seven hours to develop.

Miller testified that on April 10, 1986, he was a paramedic with an ambulance company. To become a paramedic, he recounted, he initially worked as an emergency medical technician doing basic life support such as cardiopulmonary resuscitation and mouth-to-mouth resuscitation. As a paramedic he was qualified, after approximately two years further training, to do more advanced types of life support. No motion was made to have Miller qualified as an expert in any field, and no cross-examination in voir dire of his expert qualifications was conducted.

The defendant also takes issue with the testimony of Mary Ann Purvis (a nurse involved in Eddie's care at the hospital) about an injury on Eddie's left big toe. Purvis testified that in her opinion the injury was caused by a cigarette burn. After defense counsel objected, the state elicited testimony that her opinion was based on her prior experiences working in an emergency room for six years, where, she said, she had seen cigarette burns of this nature on occasions "too numerous to count." As with Miller, there was no voir dire conducted to establish Purvis's expert qualifications, and no motion was made to have her qualified as an expert in any field.

The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field. *Phillips v. Tidwell,* 26 Tenn.App. 543, 174 S.W.2d 472, 477 (1943). The determination of whether a

witness is qualified to give expert testimony lies in the sound discretion of the trial court. *See Cordell v. Ward School Bus Mfg. Inc.*, 597 S.W.2d 323, 328 (Tenn.App. 1980).

In this case we are constrained to view both Miller and Purvis as non-expert lay witnesses, if for no reason other than the fact that the record is devoid of a judicial determination of their areas of expertise, or even a motion for such a determination. On such an underdeveloped record, we cannot hold that Miller and Purvis were qualified to give testimony that arguably required special expertise.

 Generally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified. *Blackburn v. Murphy*, 737 S.W.2d 529, 531 (Tenn.1987). This rule preserves the province of the jury as the fact-finding body designated to draw such conclusions as the facts warrant. *Id.* An exception to this general rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, *id.* at 532, such as testimony that a footprint in snow looked like someone had slipped, *National Life & Accident v. Follett*, 168 Tenn. 647, 80 S.W.2d 92 (1935), or that a substance appeared to be blood. *State v. Mabon*, 648 S.W.2d 271, 274 (Tenn.Crim.App.1982). We conclude that the nurse's testimony that the injury on the victim's foot looked like a cigarette burn arguably falls into this exception. It follows that witness Purvis's testimony was properly admitted.

 On the other hand, the non-expert testimony presented by the paramedic, Miller, was technically inadmissible. His opinion as to the source of Eddie's bruised face does not fall within the exception for opinion testimony used to describe observations such as those in *Follett* or *Mabon*. His conclusory opinion was not the type of opinion testimony that lay witnesses should be allowed to give, but rather called for specialized skill or expertise. Because Miller was not qualified to give expert opinion testimony, his testimony should not have been permitted. We cannot, however, hold this to be reversible error. There was ample evidence of skull trauma without Miller's reference to "coon eyes."

With respect to those witnesses who were properly qualified as experts but who the defendant alleges were allowed to testify outside their field of expertise, we have reviewed the record and find no error.

### 9. Admissibility of Extrajudicial Statements

The defendant asserts that the trial court erred in allowing the testimony of witnesses who said that the Browns had told them Eddie sustained his injuries in a fall downstairs. Both of the witnesses who testified to this effect spoke with Evajean and Mack Brown at the same time and could not remember which one of them said that Eddie fell down the stairs. The defendant contends that this testimony was inadmissible because the witnesses could not say with certainty that Mack Brown made the statement in question.

The defendant erroneously relies on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in contending that this evidence should have been excluded. The defendant asserts that the use of these statements at trial was akin to the use, at trial, of a co-defendant's confession containing statements tending to incriminate the non-confessing defendant. The theory for the exclusion of such confessions under *Bruton* is that the confrontation clause of the United States Constitution is violated when such a confession of a co-defendant (who denies the confession or does not testify) is admitted into evidence, because the inculpated non-confessing defendant is denied the opportunity to cross-examine the maker of the inculpating statements.

 This case is distinguishable from the problem addressed in *Bruton*. Although indicted together, the Browns were tried separately. The statements are not in the nature of a confession, and they do not

facially indicate that at the time they were made Evajean Brown blamed Mack Brown for Eddie's death. At most, they indicate that Mack and Evajean Brown acted together to try to conceal the true source of Eddie's injuries. Mack Brown's rights under the confrontation clause were not violated, because he had the opportunity to cross-examine the witnesses on the crucial issue of whether these statements were made and, if so, whether he was himself present and aware of the effort to explain Eddie's injuries.

■ These statements were certainly relevant, not because of their specific content, but because their very existence indicates that an attempt was made to explain away the source of Eddie's injuries. Moreover, there is no hearsay problem. A statement introduced to prove only that it was made, regardless of the truth or falsity of the statement, does not violate the rule against hearsay. *Cannon v. Chadwell*, 25 Tenn.App. 42, 150 S.W.2d 710, 712 (1941).

### 10. Admissibility of Photographs

The defendant contends that the trial court erred in admitting various photographs of the victim's body and in allowing these photographs to be presented repeatedly to the jury. Although the defendant concedes that the photographs may be relevant and material to establish the elements of the offense, *State v. Harbison*, 704 S.W.2d 314, 317–318 (Tenn.1986), he argues that in this case the prejudicial effect of the photographs substantially outweighs their probative value, under the standards of *State v. Banks*, 564 S.W.2d 947 (Tenn.1978).

■ Nine close-up color photographs of Eddie's body were introduced and presented to the jury. Exhibit # 2 shows Eddie's face and the front of his right ear. Exhibit # 4 shows the right side of Eddie's head with a hand folding the top of his right ear over to expose the lacerations behind and above his right ear. Exhibit # 5 is a photograph of Eddie's body from the bottom of his rib cage to just above his knees, showing bruises on his body and his genitals. Exhibit # 6 shows the bruises on Eddie's lower back and buttocks. Exhibit # 12 shows Eddie's left foot and left leg from just below the knee. This photograph depicts the injury on Eddie's left big toe. Exhibit # 13 shows the left side of Eddie's face, his left ear and the top of his chest. Exhibit # 14 shows the back of Eddie's head and neck as his body is lying on its right side. This photograph shows the injuries to his neck, his left shoulder blade, the back of his left ear and the back of his right shoulder. Exhibit # 15 shows Eddie's body from the waist down to just above the right knee. In this photograph, Eddie is wearing a diaper and his right leg is bent at the hip to show the side and back of his leg. Exhibit # 15 shows Eddie's neck, chest, and left arm to just below his elbow.

Each of these photographs is clearly relevant and admissible as evidence of the brutality of the attack and the extent of the force used against the victim, from which the jury could infer malice, either express or implied. *State v. Banks, supra,* 564 S.W.2d at 950. Each is a unique representation of a different portion of the victim's body. No two photographs depict the same injuries. Although oral testimony was also presented, graphically describing the injuries independent of these photographs, we cannot say that there was a clear showing of abuse of discretion in the admission of these photographs. *Id.* at 949.

■ The defendant also argues that, even if the photographs were relevant and admissible, their repeated presentation to the jury during the testimony of different witnesses resulted in prejudice that outweighed the probative value of their repeated use. In *State v. Banks, supra,* 564 S.W.2d at 951, we adopted Rule 403 of the Federal Rules of Evidence, which provides that even relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. Rule 403 further provides that probative value may be outweighed by the needless presentation of cumulative evidence. Thus, the cumulative effect of the repeated presentation of the same photographs could constitute prejudice outweighing their probative value,

even if an isolated photograph was otherwise admissible.

This determination rests in the sound discretion of the trial judge, however, as does the determination to admit or limit any cumulative evidence. *See Shields v. State,* 197 Tenn. 83, 270 S.W.2d 367 (1954); *State v. Reynolds,* 666 S.W.2d 476 (Tenn. Crim.App.1984). In this case, the record does not indicate an abuse of discretion in the admission of the photographs in question.

### 11. Admissibility of Other Exhibits

 The defendant complains about the admission of certain items of physical evidence, on the grounds that the state did not establish the relevance of this evidence and that the trial judge should have excluded it based on its prejudicial impact on the jury. We have reviewed this evidence and find no error in its admission. The paper bag containing vomit was relevant in light of testimony that the autopsy of Eddie's lungs revealed that he had aspirated vomit. Likewise the other items complained of— the mop, dishpan, and water, and the items of clothing—were relevant given the defendant's statement that he had attempted to clean up after Eddie had urinated, defecated, and bled on the floor.

### 12. Limitations on Expert Testimony

 The defendant alleges that the trial judge abused his discretion by restricting the testimony of defense witness Dr. Eric Engum. Engum, a clinical psychologist, testified during the guilt phase of the trial in support of the defendant's insanity theory and therefore touched on the defendant's mental retardation. During the state's cross-examination, the trial court admonished Engum on three occasions to respond to the questions without volunteering additional testimony. When the defense objected to the second admonition, requesting that Engum be allowed to explain his responses to the prosecutor's questions, the trial judge responded:

> He can explain if he needs to explain, but I don't want all of this in the record.

This jury doesn't need to hear this. Proceed.

In making yet another admonition, the trial judge said, "Doctor, this is the third time. I've warned you. I will not warn you one more time without some action."

The trial court must be given reasonable latitude in controlling the course of the trial. *Cordell v. Ward School Bus Mfg. Inc.,* 597 S.W.2d 323 (Tenn.App.1980). Having reviewed the entire record of this case, we cannot say that the trial judge abused his discretion in the manner in which he directed the course of Engum's testimony. If the trial judge did not consistently maintain a tone of patient impartiality toward a particular witness, as the defense maintains, that fact would be regrettable, of course. But it might not be subject to adequate review on appeal, simply because of the limitations of a written record. In any event, we cannot say, as the defense would have us conclude, that the trial court's demeanor in this case adversely affected the credibility of the witness. Dr. Engum's credibility was more likely affected by his total lack of prior experience as a courtroom witness than by the trial court's comments on his testimony.

### 13. Comments During Closing Argument

 The defendant argues that the trial court erred in the wide latitude given to the state during closing argument. Having reviewed the entire record in this case, including the arguments of the prosecutor and defense counsel, we can find no abuse of discretion in the manner in which the trial judge controlled closing argument. *See State v. Sutton,* 562 S.W.2d 820, 823 (Tenn.1978) (standard of review is abuse of discretion). The prosecutor is warranted in making an argument to the jury when that argument is supported by evidence introduced at trial. *State v. Beasley,* 536 S.W.2d 328, 330 (Tenn.1976). Further, the prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses were believed by the jury. *Id.* In this case, the prosecutor's argument was well-

grounded in the evidence presented at trial, recounting that evidence and the permissible inferences that could legitimately be drawn from it.

### 14. Jury Instructions

The defendant challenges the jury instructions given in the guilt phase of the trial in several respects. First, he asserts that the trial court erred in giving the following charge:

> The failure of the defendant to remember the details of the alleged crime or to remember any of the facts leading up to and surrounding the commission of the alleged crime is in itself no defense to this charge.

The state requested that an instruction on amnesia be given, in light of the defendant's statement that he remembered spanking the child only with the open part of his hand. With reference to the events of April 10, 1986, he stated, "I don't have comprehension of fully remembering what, of what might have took or did take place...." He described the period of time during which Eddie was apparently beaten as "a blank" in his mind and stated that he did not fully come back to his senses until after he arrived at the hospital.

The state initially requested an instruction that "amnesia alone" is not a defense to a criminal charge. The defense complained to the trial court that the use of the words "amnesia alone" would constitute a comment on the evidence by the court, as it would unduly characterize the evidence presented on the defendant's mental condition. On appeal, the defendant complains that the instruction as given was misleading and prejudicial because, in the context of the defense's insanity theory, an instruction relating to amnesia was irrelevant to the issues at trial.

■ The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn.1986). Although the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge, *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn.1975), the trial judge may also be required to charge the jury on matters not disputed by the defense. *See Taylor v. State*, 582 S.W.2d 98, 100 (Tenn.Crim.App. 1979).

■ The statement made by the defendant that was presented to the jury raised questions about his memory of the events surrounding his son's death. There was no error in giving an instruction necessitated by this evidence.

The defendant also alleges that the trial court erred in refusing to give a jury instruction on the lesser included offense of voluntary manslaughter. The trial court instructed the jury on the elements of first-degree murder and the lesser included offenses of second-degree murder and involuntary manslaughter.

■ At the time of trial, manslaughter was defined by statute as "the unlawful killing of another without malice, either express or implied, which may be voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act." T.C.A. § 39-2-221. Before a defendant can be found guilty of voluntary manslaughter, there must be evidence that he acted in a state of passion sufficient to obscure his reason *and* that the passion was produced by reasonable and adequate provocation. *Freddo v. State*, 127 Tenn 376, 155 S.W. 170 (1912); *State v. Morgan*, 541 S.W.2d 385 (Tenn.1976); *Howard v. State*, 506 S.W.2d 951 (Tenn.Crim.App. 1973).

■ The defendant insists that a charge of voluntary manslaughter was appropriate here, citing by analogy *Capps v. State*, 478 S.W.2d 905 (Tenn.Crim.App.1972). In *Capps*, the defendant became "ungeared, so to speak, with the birth of [her] child." *Id.* at 906. Although her husband sought medical help for the mother and placed the baby with both sets of grandparents, the child's life came to a tragic end when her mother killed her after she had been grabbing at her legs and dress and running through the house. *Id.* The mother was charged with second-degree murder and

convicted of voluntary manslaughter. Although the Court of Criminal Appeals noted that the mother was in an excited, generally distraught emotional state, brought about at least in part by the child's behavior, *id.* at 907, the court did not address whether the child's actions constituted the "reasonable and adequate provocation" element of voluntary manslaughter. Rather, the court based its holding on the distinction between voluntary and involuntary manslaughter. Because the homicide was a killing with intent to inflict the injury that produced death, as evidenced by the severity of the child's injuries, the court affirmed the jury's verdict of voluntary manslaughter. *Id.* Thus the defendant's reliance on *Capps* in this case is not well placed, because in *Capps* the rationale of the Court of Criminal Appeals did not rest on provocation.

Moreover, we believe that it is a virtual legal impossibility for a small child to commit an act that would amount to provocation sufficient to make his subsequent death voluntary manslaughter rather than murder. Because the evidence presented at Mack Brown's trial failed to satisfy the elements of voluntary manslaughter, the trial court did not err in refusing to instruct on this lesser included offense. *State v. Mellons*, 557 S.W.2d 497 (Tenn. 1977); *Owen v. State*, 188 Tenn. 459, 221 S.W.2d 515 (1949). To the extent that this holding conflicts with the language or the result in *Capps v. State, supra*, that opinion is expressly overruled.

### Conclusion

For the reasons set out above, we reverse the defendant's first-degree murder conviction, modify the judgment of the trial court to reflect his conviction of murder in the second degree, and remand the case to the trial court for resentencing.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.