## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

## JUNE 1998 SESSION



FILED

October 12, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **C.C.A. NO. 01C01-9704-CC-00136** |
| Appellee, | ) | |
| | ) | **RUTHERFORD COUNTY** |
| VS. | ) | |
| | ) | **HON. JAMES K. CLAYTON, JR.,** |
| **RICKY RAYMOND BRYAN,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First-Degree Murder) |


FOR THE APPELLANT:        FOR THE APPELLEE:


**GERALD L. MELTON**
District Public Defender
201 West Main St., Suite 101
Murfreesboro, TN 37130
(On Retrial and On Appeal)

**BRAD W. HORNSBY**
P.O. Box 398
Murfreesboro, TN 37133-0398
(At First Trial)

**JOHN KNOX WALKUP**
Attorney General & Reporter

**LISA A. NAYLOR**
Asst. Attorney General
John Sevier Bldg.
425 Fifth Ave., North
Nashville, TN 37243-0493

**WILLIAM WHITESELL**
District Attorney General
Third Floor Judicial Bldg.
Murfreesboro, TN 37130


OPINION FILED:_____



**REVERSED AND REMANDED FOR A NEW TRIAL**


**JOHN H. PEAY,**
Judge

# O P I N I O N

The defendant was indicted for and found guilty of first-degree murder. Following a hearing, the defendant was sentenced to life imprisonment. In this appeal as of right, the defendant presents the following issues for review:

> I. Whether retrial of the defendant violated his constitutional protections against double jeopardy;
>
> II. Whether the trial court erred in failing to suppress statements the defendant made to various law enforcement officers;
>
> III. Whether the trial court erred in failing to suppress statements the defendant made to people who allegedly approached him under the direction of law enforcement officers; and
>
> IV. Whether the evidence is sufficient to support the verdict beyond a reasonable doubt that the defendant is guilty of first-degree murder, that is:
>
> > A. Whether the evidence was sufficient to prove the defendant was the perpetrator; and
> >
> > B. Whether the evidence was sufficient to prove premeditation and deliberation.

We reverse and remand for a new trial.

Charlotte Scott, a seventy-two-year-old Nashville resident, was reported missing on Tuesday, October 18, 1994. Her family had found the door to her home unlocked, with no sign of forced entry. Her coffee pot was prepared to make coffee, no valuables were missing, and her automobile was parked in front of her home. No blood was found at the victim's residence.

The defendant, the victim's thirty-eight-year-old boyfriend, became a suspect. He first spoke with police on Wednesday, October 19, and the police detective with whom he spoke noticed a scratch mark on his face. The defendant stated that the last time he saw the victim was in September 1994. The police discovered that shortly after the victim disappeared, someone attempted eight separate ATM transactions on the victim's account, and three of these transactions were aborted for exceeding the amount

of money in the account. The defendant admitted using the victim's ATM card: "I used [the victim's] bank card on Sunday [October 16] to take money out at Nipper's Corner First Tennessee Anytime Teller, the day she could not be found." The significance of this statement was that up until this point, the authorities did not know exactly when the victim had disappeared.

On November 6, 1994, the defendant told his brother, Danny Bryan, that he was with the victim at the rock quarry near Sam Ridley Boulevard on the evening she disappeared. He said that on the evening of Saturday, October 15, 1994, the victim called him and asked him to come to her house. He said he did not go to her house immediately because his daughter was staying at his house. In the early morning hours of Sunday, October 16, 1994, he drove to her house. They then drove to the rock quarry. At around 2:00 a.m., he left to get the victim something to eat, but when he returned, several unidentified men were there and he could not locate the victim. He hid until the unidentified men left, went to the area where the men were, and discovered the victim's lifeless body, which he buried in the rock quarry. After the defendant admitted this to Danny, Danny reported the conversation to the local police. Sometime after that, the defendant visited Danny at his house, and Danny observed the defendant vacuuming his car.

On November 7, the police searched the defendant's house. No traces of blood or fingerprints of the victim were found in the defendant's residence or car. Acting on the information Danny gave them, the police also began searching the rock quarry for the victim's body. Within the next week, a Nashville television station interviewed the defendant on videotape. In the interview, the defendant said he did not know where the victim was and that they were distributing "missing person" fliers around town in the hope of finding her.

The defendant's son, Shannon, approached the authorities involved in the

investigation and volunteered to help them locate the victim's body. He told them he believed if he talked to the defendant, the defendant would tell him where the victim's body was located. On November 11, wired with a recording device and a transmitter and monitored by the police, Shannon met with the defendant at his house. Shannon asked the defendant if he knew where the victim's body was, and the defendant replied no. Shannon suggested that they try to find the victim's body, but the defendant refused, claiming that would create more problems for them. The defendant stated he had the victim's ATM card and had used it three times after she disappeared. He later stated he believed the victim was not dead but instead, had run away.

On November 14 around 9:00 p.m., Shannon again met with the defendant at his house. This conversation was also monitored by the police. Again, the defendant maintained he did not know where the victim's body was, but he said if he did know, he would help Shannon move it. Later, the defendant told Shannon that he knew where at the rock quarry a man's body was buried and that they should go move that body before the police found it and accused him of murdering that person. They drove to the rock quarry with a blanket and plastic to use to move the body when they found it. After walking around that area for a while, they saw a police helicopter equipped with a search light and hid.

By 3:00 a.m. on November 15, approximately six hours after Shannon had arrived at the defendant's house, the defendant and Shannon were still in the area of the rock quarry. The defendant told Shannon to return to his car and he would go on to work. The police monitoring the events found Shannon shortly thereafter. About one hour later, the LaVergne Police Department picked up the defendant at his house, handcuffed him, and returned him to the search site in the back seat of a patrol car. When they arrived, the handcuffs were removed, but the defendant's belongings were taken from him. According to the defendant, he spent a considerable amount of the morning sitting in the back of the patrol car and did not feel he was free to leave. At a pretrial hearing,

4

Detective E. J. Bernard testified he did not tell the defendant he was free to leave, but neither did he tell him he must remain at the search site. However, at trial, Detective Bernard testified that he did tell the defendant he was free to leave.

While at the search site that morning, the defendant gave a statement to Detective Bernard. He told him that the victim had visited him at his house and had asked him to go with her to the rock quarry to "make out." The defendant said he could not go with her because he was caring for his daughter, who was sleeping in the next room. The defendant left the room to check on his daughter, and when he returned, the victim was gone. He drove to the rock quarry to look for the victim. When he arrived, he saw "various individuals" there and hid until they left. He then found the victim dead and used a rake and a shovel to bury her. According to Detective Bernard, the defendant walked around the search site with him and two other police officers in an attempt to lead them to where he buried the victim's body. Later, at the defendant's request, a police officer called an attorney, Mr. Brad Hornsby, on the telephone and allowed the defendant to talk to him. Mr. Hornsby arrived at the search site, and he and the defendant left the site together. The police had no further contact with the defendant until his arrest.

Within the next couple of days, the defendant's stepnephew, Michael Thompson, visited the defendant at his house. Michael had previously volunteered to help the police by talking to the defendant in order to elicit information about the victim's disappearance. Because the defendant believed his house was bugged, he wrote to Michael on pages from a notepad instead of talking to him. The defendant told Michael he had left a rake and a shovel with his fingerprints on them in the rock quarry. Michael said he would retrieve and dispose of these items for the defendant, so the defendant drew him a map to a pit in the rock quarry where the tools would supposedly be found. After drawing the map and writing other directions in the notepad, the defendant burned the notepad's used pages.

5

Michael reported this conversation to the police. Following the directions the defendant gave him, Michael led the police to a pit in the rock quarry, in which the victim's body was found buried under layers of debris. An arrest warrant for the first-degree murder of Charlotte Scott was issued for the defendant on November 18, 1994. According to the autopsy report, the victim sustained four blows to the head by a firm, hard object. The victim's chest was compressed and her ribs were fractured forty-four times, injuries which caused the victim's death. The victim's body was then stabbed with a knife nine times and her breasts were amputated. The victim's body exhibited no defensive wounds or any sign of struggle. The weapons that caused the victim's death were not recovered.

The defendant was indicted for first-degree murder in January 1995. At trial in June 1995, the jury found the defendant guilty as charged. The trial judge, sitting as thirteenth juror, granted the defendant's motion for a new trial. The defendant's second trial was held in April 1996. Again, the jury found the defendant guilty of first-degree murder. Following a hearing, a life sentence was imposed on the defendant.

## I.

The defendant first argues that his retrial violated the Double Jeopardy Clause. Following a guilty verdict in his first trial in June 1995, the defendant filed a Motion for Judgment of Acquittal and a New Trial. In this motion, the defendant argued that because the evidence was legally insufficient, in that it did not prove premeditation, deliberation, venue, or that the defendant was the perpetrator, he was entitled to a judgment of acquittal. In the alternative, the defendant argued that he was entitled to a new trial under Tennessee Rule of Criminal Procedure 33 because of the numerous prejudicial errors that occurred throughout the trial and because the weight of the evidence showed he was not guilty of first-degree murder. The trial judge notified the parties via letter of his ruling on this motion. In his letter, the trial judge stated, in pertinent part:

6

I find myself in the position that I disagree with the jury on the weight of the evidence presented on the elements of premeditation and deliberation. I, therefore, find it necessary to grant the defendant's request for a new trial. I specifically overrule the request for a judgment of acquittal.

Having made the determination to grant the motion for new trial as the 13th juror I would find it appropriate to have this case transferred to another court for the retrial of this matter in accordance with Rule 33 on the request of either party.

I will draw an order reflecting the court's finding and notify each party of its execution.

The subsequent order stated:

This court having considered a Motion for a Judgment of Acquittal and/or Motion for New Trial, finds it necessary to grant the defendant's request for a Motion for New Trial under the provisions of Rule 33(f) of the Tennessee Rules of Criminal Procedure. As a 13th juror this court disagrees with the jury about the weight of the evidence on the issues of premeditation and deliberation and, therefore, grants the defendant's request for a new trial and the transfer of this case to another trial court for the trial of the matter on the request of either party.

The defendant filed a Motion for Specific Findings, in which he asked the trial court to make specific findings that there was no evidence submitted as to venue, premeditation, or deliberation. The defendant also requested the trial court "to reconsider his previous Motion for Judgment of Acquittal and dismiss the case against him." Further, the defendant moved for permission to appeal to this Court, arguing that because the State failed to prove venue, that the defendant committed the crime, or that the defendant had the requisite intent, the Double Jeopardy Clause would bar his retrial.

The record fails to reveal an order addressing the defendant's Motion for Specific Findings. The trial court did address the defendant's Motion for an Appeal by Permission, however, stating, "As to the Motion for an Appeal by Permission, after reviewing said motion the Court finds at the time this Court granted defendant's motion for a new trial it was granted on all issues and therefore denied defendant's request for

7

appeal." The trial court also stated, "Further, upon request of the State, under 33 (f) of the Tennessee Rules of Criminal Procedure this case is transferred to the Presiding Judge, the Honorable Don Ash for assignment to another Court for retrial."

The defendant sought extraordinary appeal in this Court, claiming that double jeopardy protections barred a new trial. This Court denied the defendant's request. The case proceeded to the new trial, after which the jury returned a verdict of guilt. The defendant now argues that because the trial court granted his new trial motion "on all issues," double jeopardy protections barred retrial of this case.

Double jeopardy protections are implicated when the evidence is found to be legally insufficient to support a defendant's conviction. Tibbs v. Florida, 457 U.S. 31, 41 (1982). Legal insufficiency "means that the government's case was so lacking that it should not have even been submitted to the jury." Id. (quoting Burks v. United States, 437 U.S. 1 (1978)). To contrast, double jeopardy protections are not implicated when a court, sitting as a thirteenth juror, decides that a guilty verdict is against the weight of the evidence because it disagrees with the jury's resolution of conflicting evidence. Id. at 42.

In his Motion for Judgment of Acquittal and a New Trial, the defendant argued he was entitled to a judgment of acquittal because the evidence was legally insufficient. In the alternative, the defendant requested a new trial because the weight of the evidence was contrary to the verdict. The trial court, sitting as thirteenth juror pursuant to Tennessee Rule of Criminal Procedure 33(f), agreed that the weight of the evidence was contrary to the verdict and thus granted the defendant a new trial. However, the trial court explicitly denied the defendant's motion for judgment of acquittal, thus rejecting the defendant's argument that the evidence in this case was legally insufficient. As such, double jeopardy concerns were not implicated by the trial court's order. Nothing changed when the trial court later stated that it granted the defendant's

8

motion for a new trial "on all issues" because the defendant's basis for arguing entitlement to a new trial was that the weight of the evidence was contrary to the verdict, which does not implicate double jeopardy concerns. Our careful review of the record reveals nothing even suggestive of the notion that the trial court ever determined that the convicting evidence was legally insufficient. Thus, contrary to the defendant's contentions, the second trial in this case, which is what the defendant himself requested, did not violate the Double Jeopardy Clause. This issue is without merit.

## II.

The defendant next argues that the trial court erred in failing to suppress the statement he made to Detective Bernard on November 15, 1994, at the search site. He contends that at the time he gave the statement, he was in custody and had not been read his Miranda rights. The defendant also contends that the statement should be suppressed because the police officers knew he was represented by counsel at the time he gave the statement.

The Fifth Amendment provides the right to counsel at any police-initiated custodial interrogation. E.g., Edwards v. Arizona, 451 U.S. 477 (1981); State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996); State v. Bates, 804 S.W.2d 868 (Tenn. 1991). Miranda v. Arizona bars the admission of any statements elicited from the defendant through custodial interrogation unless the defendant, prior to making the statement, was warned of certain rights and knowingly waived those rights. 384 U.S. 436 (1966). "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. In other words, Miranda warnings are required when a suspect has been formally arrested or when his or her freedom of movement has been restrained to the degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121 (1983); State v. Cooper, 912 S.W.2d 756 (Tenn. Crim. App.

9

1995).

In assessing whether an individual is "in custody," the totality of the circumstances must be examined to determine whether a reasonable person would consider his or her freedom of movement restrained to the degree associated with formal arrest. State v. Anderson, 937 S.W.2d 851 (Tenn. 1996). Factors relevant to this determination include the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855.

Here, the trial court found that the police were not aware the defendant had retained Mr. Hornsby until after he had been transported to the rock quarry, made his statements to Detective Bernard, and called Mr. Hornsby to pick him up. While the record supports this finding, it is immaterial to the disposition of this issue under a Fifth Amendment analysis. Rather, the dispositive issue is whether the defendant was subject to a police-initiated custodial interrogation and had knowingly waived his Fifth Amendment rights at the time he made his statements to Detective Bernard.

Under the circumstances of this case, we must conclude that the

defendant's Fifth Amendment rights were violated. At 4:00 a.m., the defendant was handcuffed, placed in the back of a patrol car, and driven to the rock quarry. His personal belongings were taken from him as he was escorted by police officers around the search site and questioned. Given these circumstances, a reasonable person would not feel free

to leave.[1]  The defendant's freedom of movement had been restrained to the degree associated with formal arrest, which triggered the need for <u>Miranda</u> warnings under the Fifth Amendment.  <u>See, e.g.</u>, <u>Beheler</u>, 463 U.S. at 1121.  Unfortunately, however, the defendant had not been informed of his <u>Miranda</u> rights.  That being so, the defendant's statement to Detective Bernard was obtained in violation of his Fifth Amendment rights, and it should have been suppressed.  Moreover, we believe that the evidence does not justify a conclusion that the error was harmless beyond a reasonable doubt.

### III.

The defendant also argues that the trial court erred in failing to suppress statements he made to his son, Shannon, and to his stepnephew, Michael.  As support for his argument, he claims Shannon and Michael were acting as agents of the police at the time he talked with them.

The Sixth Amendment right to counsel attaches only after the adversarial judicial process has begun.  <u>Huddleston</u>, 924 S.W.2d at 669 (citing <u>Michigan v. Jackson</u>, 475 U.S. 436 (1986); <u>State v. Mitchell</u>, 593 S.W.2d 280 (Tenn. 1980)).  "In Tennessee, the adversarial judicial process is initiated at the time of the filing of the formal charge, such as an arrest warrant, indictment, presentment, or preliminary hearing in cases where a warrant was not obtained prior to the arrest."  <u>Id.</u>  Here, the defendant's conversations with his son, Shannon, occurred on November 11 and November 14, and his

---

[1]We recognize that Detective Bernard testified at the suppression hearing that he did not tell the defendant he was free to leave, but then testified at trial that he did in fact tell the defendant he was free to leave.  We also recognize that the recent Tennessee Supreme Court case of <u>State v. Johnny M. Henning</u>, No. 02S01-9707-CC-00065, Madison County (Tenn. filed June 22, 1998, at Jackson)(pending publication), allows us to consider evidence adduced at trial in determining whether to suppress evidence.  However, given the conflict in Detective Bernard's testimony, and given the totality of the circumstances, we would still conclude that a reasonable person in the defendant's place would not have felt free to leave.

conversation with his stepnephew, Michael, occurred some time between November 15 and November 17. An arrest warrant was issued for the defendant on November 18, after the defendant's conversations with Shannon and Michael. Thus, the defendant's Sixth Amendment right to counsel had not attached at the time of his statements.

The defendant concedes that the Sixth Amendment right to counsel does not attach until formal charges are filed, but he urges this Court to apply the Sixth Amendment to circumstances in which the defendant becomes the focus of a police investigation.[2] Given the clear line of authority, including United States Supreme Court authority, we decline to do so. See, e.g., Payne v. Johnson, 2 Tenn. Cas. (Shannon) 542, 543 (1877)(intermediate appellate courts have no authority to disregard higher courts' precedent).

## IV.

Finally, the defendant challenges the sufficiency of the convicting evidence. The defendant contends that the evidence failed to establish that he was the perpetrator and that the victim was killed after premeditation and deliberation.

A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the State's witnesses, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Thus, when an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh

---

[2]What the defendant urges is a rule similar to that once applied in the context of the Fifth Amendment right against self-incrimination, i.e., that once the investigatory process shifts from the investigation stage to the accusatory stage, the defendant's rights are triggered. See Escobedo v. Illinois, 378 U.S. 478 (1964). That rule has since been completely abolished. See, e.g., Stansbury v. California, 511 U.S. 318 (1994); see also Anderson, 937 S.W.2d at 854; Cooper, 912 S.W.2d at 766.

or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

## A.

The defendant admitted to using the victim's ATM card shortly after the victim disappeared. The evidence showed that someone attempted eight separate ATM transactions, three of which were aborted for insufficient funds, on the victim's account. The evidence also revealed that the defendant knew that the victim "disappeared" on October 16, even though the victim's family, who discovered her missing, did not report her missing until October 18. Just days after the victim's disappearance, the defendant had a red scratch across his neck.

Moreover, the defendant told inconsistent stories to various people at different times. On October 19, in his initial interview with the police, the defendant stated the last time he saw the victim was in September 1994. On November 6, he confided in his brother, Danny, that he and the victim were at the rock quarry in the early morning of October 16 and that he buried the victim there. In a videotaped interview with a television station some time between November 7 and November 14, the defendant denied knowing anything about the victim's disappearance. On November 11, the defendant told his son, Shannon, that he did not believe the victim was dead but that she had merely "run away." When he talked with Shannon again on November 14, the defendant denied knowing anything about where the victim's body might be located, but he said he knew where someone else's body was buried in the rock quarry. Yet just hours later, the defendant told Detective Bernard a story similar to what he told his brother, Danny, i.e.,

13

that he had buried the victim at the rock quarry.[3]

Further, the defendant accompanied Shannon to the rock quarry to search for a body and further conceal it from the authorities with plastic and a blanket. He also asked his stepnephew, Michael, to dispose of a rake and a shovel that he left at the rock quarry and that supposedly had his fingerprints on them. Following the directions the defendant gave him, his stepnephew led the authorities to a pit in the rock quarry, in which the victim's body was found. Considering the totality of this evidence in the light most favorable to the State, a rational jury could have concluded, on the evidence presented to it, that the defendant was responsible for the victim's death.

**B.**

The defendant also challenges the sufficiency of the evidence as to the elements of premeditation and deliberation. Premeditation requires proof that the defendant had a previously formed design or intent to kill. T.C.A. § 39-13-210(b)(2) (1991); State v. Brown, 836 S.W.2d 530 (Tenn. 1992); State v. West, 844 S.W.2d 144 (Tenn. 1992). Deliberation requires a showing that the defendant had some time to reflect and that his mind was free of impulse and passion prior to the killing. T.C.A. § 39-13-210(b)(1); Brown, 836 S.W.2d at 540. The elements of premeditation and deliberation are questions for the jury that may be established by proof of the circumstances surrounding the killing. Id. at 539. Several factors tend to support the existence of these elements, including the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of

---

[3]It is inappropriate to assess the sufficiency of the evidence based only on the properly admitted evidence. See, e.g., State v. Longstreet, 619 S.W.2d 97 (Tenn. 1981); State v. Robert Lee "Flippo" Morris, C.C.A. No. 1195, Hamilton County (Tenn. Crim. App. filed November 20, 1991, at Knoxville). Thus, even though we hold that the statement given to Detective Bernard was improperly admitted, we must consider it in determining whether the evidence presented to the jury is sufficient to sustain a guilty verdict.

the crime; and calmness immediately after the killing. <u>State v. Bland</u>, 958 S.W.2d 651, 660 (Tenn. 1997).

Here, the victim was a seventy-two-year-old woman. The defendant admitted being with the victim just prior to her death. The defendant also admitted burying the victim under debris in a pit at the rock quarry. No blood was found in the defendant's residence, the defendant's car, or the victim's residence, suggesting that the victim was killed at the rock quarry. The rock quarry is a relatively remote location, a fact which could support findings of premeditation and deliberation. <u>See, e.g.</u>, <u>State v. Williams</u>, 784 S.W.2d 660 (Tenn. Crim. App. 1989).

The victim sustained four blows to the head by a firm, hard object. According to the medical examiner, these injuries would not, by themselves, cause death, but they would be sufficient to stun an individual or cause unconsciousness. The victim's chest was compressed and her ribs were fractured forty-four times, injuries consistent with being run over by a motor vehicle. The nature of the victim's death, that she was likely stunned or knocked unconscious and then run over by a car, indicate that the perpetrator had ample time to reflect on his actions and that he intended his actions to kill the victim. The assault on the victim did not end there, however. Post-mortem, the victim's body was stabbed with a knife nine times and her breasts were amputated. The victim's body exhibited no defensive wounds or any sign of struggle, indicating, in the medical examiner's opinion, that the victim was unable to defend herself or was taken by surprise.

Construing this evidence in the light most favorable to the State, a rational jury could have concluded, on the facts presented to it, that the defendant, without passion or provocation and with a cool purpose, consciously engaged in the conduct causing the victim's death. <u>See, e.g.</u>, <u>State v. Bush</u>, 942 S.W.2d 489, 502 (Tenn.

15

1997)(evidence that defendant hit victim with a board and then retrieved a second weapon, a knife, to continue attack is probative of premeditation).  Therefore, the evidence in this record is sufficient to establish premeditation and deliberation.

**CONCLUSION**

In sum, retrial of the defendant did not violate the constitutional protections against double jeopardy. Moreover, the State presented sufficient evidence to prove that the defendant was the perpetrator and that he killed the victim with premeditation and deliberation.  Finally, while the trial court properly admitted into evidence the statements the defendant made to his son and his stepnephew, the statement the defendant made to Detective Bernard on November 15, 1994, violated the defendant's Fifth Amendment right against self-incrimination and should have been suppressed.  Accordingly, we remand for a new trial without introduction of the statement given to Detective Bernard.

_____
JOHN H. PEAY, Judge


CONCUR:


_____
JOSEPH M. TIPTON, Judge


_____
DAVID G. HAYES, Judge