# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 16, 2003 Session

## STATE OF TENNESSEE v. RICKY RAYMOND BRYAN

### Direct Appeal from the Circuit Court for Rutherford County
### No. F-32368     James K. Clayton, Judge

### No. M2002-03015-CCA-R3-CD - Filed December 29, 2003

Defendant, Ricky Raymond Bryan, was first tried and convicted of the first degree murder of Charlotte Scott in 1995. At the conclusion of Defendant's first trial, the trial judge, acting in his capacity as thirteenth juror, granted Defendant's motion for a new trial. Defendant's second trial was held in April 1996, and the jury once again found Defendant guilty of first degree murder and sentenced him to life imprisonment. On appeal, this Court remanded for a new trial because the introduction of Defendant's statement of November 15, 1994, violated Defendant's Fifth Amendment right against self-incrimination. At the same time, this Court held that the evidence was sufficient to sustain the conviction. *State v. Bryan*, 990 S.W.2d 231, 241 (Tenn. Crim. App. 1998). Following a third jury trial, Defendant was again convicted of first degree murder and sentenced by the jury to life imprisonment without the possibility of parole. Defendant now appeals his conviction arguing that the evidence was insufficient to show beyond a reasonable doubt that Defendant was the person who killed the victim, Charlotte Scott. Alternatively, Defendant argues that the evidence was insufficient to establish that Defendant acted with premeditation and deliberation as required at the time of the offense in order to sustain a conviction of first degree murder. Defendant also contends that the evidence was insufficient to support the jury's finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious bodily injury beyond a reasonable doubt. After a thorough review of the record, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Gerald L. Melton, District Public Defender, at trial and on appeal, and Sean G. Williams, Assistant Public Defender, at trial, for the appellant, Ricky Raymond Bryan.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; Paul A. Holcombe, III, Assistant District Attorney; and John W. Price, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. The Trial**

The victim's family filed a missing person report with the Metro Nashville Police Department on Tuesday, October 18, 1994. The report indicated that the seventy-two year old victim disappeared from her apartment some time between October 15 and October 16. David Miller, a homicide detective with the police department at the time of the offense, conducted the initial search of the victim's apartment. The apartment was neat and orderly and showed no signs of a struggle. The coffee pot was filled with water and coffee, a routine the victim generally performed prior to retiring for the evening. The victim's car was parked in front of the apartment building and showed no sign of tampering. A luminol test did not detect the presence of any blood in either the apartment or the victim's car. Detective Miller found a drug store receipt in a trash can showing that a prescription for the victim was filled at 3:48 p.m. on Saturday, October 15.

Detective Miller then investigated whether the victim's bank account reflected any recent activity. An initial discussion with First American National Bank, the victim's bank, revealed that the victim's bank card had been used to withdraw $40.00 from a First American Bank automated teller machine (ATM) sometime after 3:00 p.m. on Friday, October 14 and before Monday morning, October 17. Three other inquiries between October 14 and October 17 were made with the victim's bank card after the $40.00 cash withdrawal at a First Tennessee Bank ATM located at Nipper's Corner.

The victim's family told Detective Miller that Ms. Scott had been dating Defendant for a period of time but had recently broken off the relationship. Detective Miller interviewed Defendant at his workplace on October 28, and Defendant said that he did not know where the victim was. Defendant told Detective Miller that he first met the victim in 1988 when he was thirty-two years old. The victim told Defendant she was fifty years old. After their initial meeting, the couple dated until August 1994 when the victim became angry with Defendant because he fixed a bicycle for a girl who lived in the victim's neighborhood. When Defendant tried to call the victim the next day, she hung up the telephone. Defendant called the victim on September 23 to tell her that his son had run away. After that date, the victim called Defendant a couple of times to see how he was doing. On Friday, October 14, the victim called Defendant and they talked for fifteen or twenty minutes. Defendant said that he worked on Saturday, October 15, and did not see the victim. The next day, Defendant and his daughter, Kimberly Bryan Cowart, stopped by the victim's apartment after church. Although the victim's car was parked outside the building, she did not answer Defendant's knock, and Defendant and his daughter left. During the interview, Detective Miller noticed a long scratch along the left side of Defendant's face but no other bruises, scrapes or scratches.

At the time of the offense, Ms. Cowart was ten years old. Detective Miller interviewed Ms. Cowart on November 3. Ms. Cowart said that the victim called Defendant on Saturday night, October 15, and she and Defendant talked fifteen or twenty minutes. When Ms. Cowart went to bed, Defendant was still talking with the victim. Ms. Cowart and Defendant stopped by the victim's

2

apartment on October 16 after church, but the victim was not home. Ms. Cowart said that she and Defendant then went to Nipper's Corner, and Defendant attempted to retrieve some money from an ATM with a bank card. At trial, Ms. Cowart added that before she and her father went to church on October 16, Defendant paced back and forth in their apartment repeating, "I don't want to go to jail."

On cross-examination, Ms. Cowart said that she told her mother about Defendant's remarks "probably about three years ago." Ms. Cowart did not think it was necessary to tell the police because Defendant had already been sentenced for the offense. She first told the prosecutors about the statement the day before the third trial. Ms. Cowart confirmed on redirect that she had not testified in the first two trials.

Defendant consented to a search of his house and car on November 3, but no evidence was found to connect Defendant to the victim's disappearance. A luminol test performed on Defendant's car did not reveal any particles of blood.

Detective Miller interviewed Defendant again on November 4 after his conversation with Ms. Cowart. At this time, Defendant gave a second statement in which he admitted that he tried to withdraw some money with the victim's bank card at a First Tennessee ATM located at Nipper's Corner "on the day [the victim] could not be found."

The prior trial testimony of Fran Foxen, the custodian of the records of First American National Bank, and Sandy Kelly, a loss prevention officer with First Tennessee Bank, was read into the record. Ms. Foxen testified that the victim had opened a checking account with First American National Bank on April 1, 1991, and had been issued only one bank card. The victim's bank card had been used to make a cash withdrawal in the amount of $40.00 at 3:28 p.m. on Saturday, October 15, from a First American ATM located in Hickory Plaza. The balance of the victim's account after the cash transaction was $21.88. On October 16, three inquiries were made with the victim's bank card at a First Tennessee ATM located in Nipper's Corner. The first transaction was an attempt to withdraw $200, the second was an attempt to withdraw $100, and the third transaction was an inquiry as to the account's balance. Ms. Foxen testified that between September 13 and October 15 the victim had only used her bank card at the First American ATM at Hickory Plaza.

Ms. Kelly testified that Defendant had previously held an account with First Tennessee Bank and had closed the account on July 21, 1993. Defendant had been issued a bank card for the account. On October 16, the victim's bank card was actually used to make a total of eight inquiries at the First Tennessee ATM located at Nipper's Corner. Five of the transactions failed and, therefore, had not been submitted to the host bank, First American. All eight transactions occurred within approximately two minutes. The three completed transactions included a request for $200, followed by a request for $100, and, lastly, an inquiry as to the balance of the victim's account.

Danny Bryan, Defendant's brother, testified that Defendant had dated the victim about seven years. On November 6, after dinner at a local steakhouse, Defendant told Mr. Bryan that he wanted to speak with him in private. Later that evening, the two men walked to a set of railroad tracks

3

which ran between an apartment complex and a shopping center near Defendant's house. Defendant told Mr. Bryan that he knew where the victim was because he had buried her in a rock quarry near Sam Ridley Parkway. Defendant told Mr. Bryan that the victim asked him to come to her house on October 15 when she telephoned that night. Defendant waited until his daughter was asleep and then drove to the victim's house around midnight. The victim suggested that they go to the rock quarry so they could talk. After they arrived, the victim told Defendant that she wanted something to eat, and Defendant left the victim sitting alone on a blanket while he went back into town to get some food. When he returned, Defendant could not find the victim. Defendant told Mr. Bryan he spotted a vehicle down the road and heard three or four male voices. After the men left, Defendant explored the area where the men had been and found the victim dead. Defendant said that he pulled the victim into the woods by her legs and buried her. When Mr. Bryan asked why he buried the victim, Defendant responded that he did so because he was scared. Defendant denied that he had anything to do with the victim's death.

Mr. Bryan said that he did not know what to do with the information. After dropping Defendant off at his house, Mr. Bryan and his wife, Rosa, started to drive back to their home in Sparta. Along the way, they stopped and attempted to call Detective E. J. Bernard, an investigator assigned to the victim's case, and Crime Stoppers, but no one answered the calls. Mr. Bryan could not sleep that night and went to the White County Sheriff's Office around 1:00 a.m. on November 7 to report his conversation with Defendant. Sheriff James O'Connor immediately contacted the Metro Nashville Police Department.

At this point, Defendant's prior testimony at a hearing to set bail on December 12, 1994 was read into evidence. In his testimony, Defendant said that he had a relationship with the victim. Defendant confirmed that he told Danny Bryan that he had taken the victim to the rock quarry, left her alone while he went to town, and found her dead when he returned. Defendant denied that he took his son, Shannon Bryan, to the rock quarry to search for the victim on November 14, and denied that he had talked with his step-nephew, Michael Thompson, about the victim.

Clayton Thomas, an investigator with the Smyrna police department at the time of the offense, testified that the police initiated a search of the area surrounding the rock quarry near Sam Ridley Parkway on November 7 based on the general information provided by Danny Bryan. The territory was divided into four quadrants, and a dozen or more people joined in the search. The rocky and woody terrain was difficult to negotiate, and eventually this search was unproductive.

A search warrant for Defendant's residence was issued on November 7. In addition to searching Defendant's house, the police dug up the in-ground swimming pool that had been installed about two weeks earlier. The police did not find any evidence linking Defendant to the victim's disappearance. A few days after his conversation with Danny Bryan on November 7, Defendant was interviewed by a local television station. Defendant told the reporter that he did not know where the victim was and asked the public's assistance in finding the victim.

4

Officer Thomas said that he talked with Defendant's son, Shannon, who agreed to approach his father. On November 11, the police officers equipped Shannon with a body transmitter in order to tape his conversation with Defendant. During this conversation, however, Defendant refused to go along with Shannon's suggestion that they search for the victim's body and denied knowing where the victim was buried. Instead, Defendant said that he believed the victim had simply left town and was still alive. Defendant admitted that he had one of the victim's bank cards and had accidently burned it in his wood stove along with some other papers.

Shannon was once again equipped with a body transmitter on November 14. Although Defendant still denied knowing where the victim was buried, he told Shannon that another body was buried at the rock quarry. Defendant said he had been looking around the quarry area for a place to camp when he heard male voices in the woods. He heard a gunshot and then saw the men carrying a man's body into the woods. Defendant said that he was scared the police would try to accuse him of killing the man if they discovered the body. Defendant told Shannon that they should move the body, so Defendant and his son loaded a piece of black plastic and a blanket into Shannon's car. Defendant warned Shannon to wear different shoes so the police could not match his footprints. The two men drove to a cleared area behind LaVergne High School and parked at the edge of the woods.

Around 3:30 a.m., the police officers lost the signal from Shannon's transmitter and called for helicopter assistance because they were concerned for Shannon's safety. When they saw the helicopter, Defendant and Shannon ran in different directions and were apprehended a short while later. The police subsequently found the plastic and blanket under some rocks in a rock pile located along the edge of the woods.

The police officers now focused their search for the victim in the area where Shannon had parked his car on November 14, but this search, too, proved unsuccessful. On November 15, Defendant's step-nephew, Michael Thompson, talked with the victim's son as they watched the progress of the search. Mr. Thompson decided to approach Defendant about the victim and went to Defendant's house on the evening of November 15. When he arrived, Mr. Thompson asked Defendant if he had killed the victim, and Defendant said "no, no." Defendant motioned to Mr. Thompson that the house was bugged and indicated that he wanted Mr. Thompson to lift his shirt and remove his pants to show that he was not wired with a transmitter. After Mr. Thompson complied with Defendant's request, the two men conversed by writing back and forth in a notebook. As each page was filled, Defendant tore the page out of the notebook and burned it in his wood stove.

Mr. Thompson asked Defendant if there was anything he could do to help him. Defendant told Mr. Thompson that when he went to the rock quarry to search for the victim, he had left behind a rake and shovel. Defendant drew a map in the notebook to show Mr. Thompson where to find the tools. Defendant noted the location of Sam Ridley Parkway, LaVergne High School, and an access road leading to the rock quarry on the map. Defendant indicated that the rake and shovel were located about fifteen feet from the access road. He said that the pit located in this area was filled with debris and old mattresses which Defendant used to hide the tools. Defendant then burned the

5

map. Mr. Thompson, however, described the location of the tools based on the information provided by Defendant to Officer Thomas. Police officers searched the area indicated on Defendant's map and within minutes found the victim's body in a debris-filled pit.

Rosa Bryan discovered the notebook in December while she and her husband were staying in Defendant's house after his arrest and gave it to Officer Thomas. At trial, Grant Sperry was qualified as an expert in forensic document examination. Based on the decipherable impressions and indented writings found in the notebook, Mr. Sperry was able to make out some of the words on a drawing that appeared to be a map including, among others, "Sam Ridley," "school," "shovel and rake," and "where dozer has cleared." Mr. Sperry compared the features and characteristics of the indented writings on the notebook's remaining pages with known samples of Defendant's handwriting. Based on this comparison, Mr. Sperry testified that the indented writings in the notebook had been made by Defendant.

Keith Lowery, a police officer with the Smyrna police department, participated in the search conducted on November 16. He said that the pit in the area reflected on Defendant's map had been searched earlier by a cadaver dog without any indication of a body. A closer inspection of the pit, however, indicated that fresh soil had been spread over the leaves that littered the top of the pit. The rocks surrounding the pit were lying with the darker, wet side facing up indicating that the rocks had been moved from their original location. Based on these discoveries, Officer Lowery and other officers began removing the debris that filled the pit. When they reached the bottom of the pit, they discovered a mound of fresh dirt covering the victim's body. The body was buried eight to ten feet below ground level with six to nine inches of dirt on top of the body.

On cross-examination, Officer Lowery said that a car could be driven into the cleared area near the pit but not into the pit itself. On recall, Officer Thomas testified that the pit was within a fifteen to twenty-minute drive from the victim's apartment.

Police officers searched Defendant's residence again on November 17 for body tissue, and his car was searched on December 14. Neither search revealed any physical evidence tying Defendant to the victim's death.

Doctor Charles Harlan performed the autopsy on the victim and testified that the victim had suffered numerous injuries both before and after death. The victim had two lacerations on the front of her head and two lacerations on the back of the head. The lacerations were not stab wounds but were caused by a blow from a hard object, such as a lead pipe or baseball bat, with enough force to render the victim unconscious. Both of the victim's arms were broken one inch below the wrist. The victim's death, however, resulted from a blunt force trauma to the chest which fractured the victim's ribs in forty-four places. The fractures impeded the victim's ability to breathe and caused internal hemorrhaging resulting in death within five to ten minutes. Dr. Harlan testified that the victim's chest injuries were consistent with injuries that would be sustained if the victim had been run over or struck by an automobile. After the victim had died, she was stabbed several times in the abdomen and on the thighs and both of her breasts were amputated.

6

On cross-examination, Dr. Harlan said that it was possible, but not probable, that the victim had suffered the head injuries and broken arms when she was run over or struck by the automobile as opposed to before. The lacerations and wrist injuries, however, were on areas which would not normally be impacted by the type of compression injury that caused the victim's broken ribs. Dr. Harlan said that the victim's head showed no sign of crushing and noted that it was possible for an object to crush the victim's rib cage without crushing her head. Dr. Harlan stated that the type of chest injuries suffered by the victim could also have been incurred if the victim fell from a height of three hundred or more feet onto a hard surface, or fell out of an airplane without a parachute.

Although he had not done so in the prior trials, Defendant elected to testify at his third trial. Defendant said that he met the victim at the Starlight Club in 1988 or 1989. They began dating after that initial meeting, but Defendant denied that their relationship was sexual. Defendant said that he merely looked after the victim because she was older and single.

Defendant confirmed that he spoke with his brother on November 6 but denied that he told Danny he had buried the victim at the rock quarry. Defendant explained that he and Danny went to the railroad tracks to look for Shannon. Defendant said that he had been suggesting all weekend that Danny help him find the victim's body because the police had told Defendant that if he found the body alone, he would be accused of killing her. Defendant told Danny that he had been at the rock quarry with the victim on Wednesday, October 12, and had returned on Thursday or Friday to look for a place to camp. Defendant said some men had been at the quarry then, and he thought perhaps the victim was also there. Defendant said he could not recall telling Danny that he had buried the victim.

Defendant said that the police told him that his son, Shannon, was a suspect in the investigation. Defendant said that Shannon asked him on three different occasions to go with him to search for the body. Defendant explained that he discussed the victim's disappearance with Shannon because he was trying to find out "firsthand" what Shannon knew. On November 14, they were discussing the victim when Shannon suddenly grabbed a blanket and some plastic and left the house. Defendant was caught off guard and followed Shannon "without thinking." Defendant did not expect to find the victim's body and thought they were going to look for a man's body at the rock quarry. Defendant said he told Shannon that they would have to contact the police if they found a body. When the police surrounded their search area, Defendant told Shannon to return to his car, and then he ran in a different direction to deflect the police's attention from Shannon.

Defendant said that Mike Thompson came to see him around 8:00 p.m. on November 15. According to Defendant, Mr. Thompson rushed into Defendant's house, stripped off his clothes, and said that he was not wearing a wire. Defendant said that he just laughed at Mr. Thompson because he already knew that his house was bugged and that Shannon had been wired with a body transmitter on November 14. Defendant explained that Shannon told him that he had left some tools at the rock quarry, and Mr. Thompson asked Defendant to draw a map showing him where the tools were located based on Shannon's directions. Mr. Thompson then described a different location and

7

confused Defendant. Mr. Thompson asked Defendant to burn the pages from the notebook, and Defendant did so in order to protect him.

On cross-examination, Defendant denied that he drew the map that was reconstructed from the indented writings in his notebook and insisted that Mr. Thompson took the map Defendant drew with him. Defendant, however, said that he may have written the words "Sam Ridley" on the map. He did not write the words "shovel and rake" because he did not know what kind of tools Shannon had left at the rock quarry, and Defendant did not own a shovel. Defendant said the handwriting may have been Shannon's because Shannon often "use[d] his handwriting," and Shannon's writing displayed the same writing characteristics as Defendant's writing.

Defendant said his first statement on November 4 simply said, "I used Lottie's bank card." Officer Miller tore up the statement and told Defendant to rewrite it adding the words "Sunday to take out money at Nipper's Corner the day she could not be found." Defendant said that he often used the victim's bank card but denied using the card on October 16. Defendant explained that he only told Shannon that he had burned the victim's bank card because Defendant thought Shannon took the card and wanted to see how he would respond.

Defendant said that he last saw the victim on Wednesday, October 12, at the rock quarry which was located in the southwest quadrant of the search area. They sat on the hood of the car, talking and looking at the stars. The couple had been to the quarry on three previous occasions during their relationship.

Defendant said that although he had left the victim alone at the quarry on October 12 while he went to get some food, she was alive when he returned. He saw some men in the woods on Thursday or Friday, not Wednesday night. Defendant said that any inconsistencies with his prior testimony concerning the events of October 12 was because he was in a trance at the earlier hearing.

Defendant said that the victim telephoned him on October 15 around 10:45 p.m. Shannon's ex-girlfriend, Dorothy, was visiting and left Defendant's house around 11:00 p.m. Defendant said that he fell asleep while talking to the victim and was awakened by his brother at about 12:50 a.m. Mr. Bryan had fought with his wife and needed a place to stay. Defendant fell asleep again and woke up about 4:00 a.m. when his brother left. Defendant denied leaving his house at any point that night and said his car was blocked by Mr. Bryan's. He denied that he told his daughter that he did not want to go to jail.

On cross-examination, Defendant insisted that the victim had at least two bank cards from First American and that he still had an account at First Tennessee Bank at the time of his arrest. Defendant said that the victim often asked him to use her bank card when she needed cash.

Danny Bryan was recalled to the stand and testified that he did not go to the Defendant's house at 1:00 a.m. on October 16 although he may have been over there at some point during the

weekend. He also reiterated that Defendant told him he had buried the victim at the rock quarry, and Mr. Bryan believed Defendant had done so.

On the basis of this evidence, the jury found Defendant guilty of first degree murder.

## II. The Sentencing Hearing

Rosa Lee Kelsey and Krista Brumfield, the victim's daughters, testified about the effect the victim's death had on them individually and on the family as a whole. Ms. Kelsey said that the family was torn apart for awhile because they could not talk about their mother without becoming upset. Both Ms. Kelsey and Ms. Brumfield had been through counseling to help them cope with their mother's death.

Defendant next testified. He said that prior to his arrest he had been employed for about thirteen years by Allvan Corporation in LaVergne, Tennessee, and had purchased his home in 1981. Until his arrest for the victim's murder, Defendant said that he had never encountered any legal difficulties other than a speeding ticket. Defendant said that he led a secret life devoted to helping people. At night, he would load his car with gasoline, oil, water, antifreeze, hubcaps and other automotive parts. Defendant said he would then drive around the area looking for people who had car trouble or who needed a ride, particularly hitchhikers. Defendant said that he graduated from Franklin High School. Although he did not find out until years later, Defendant said he was voted "most likely to succeed." Defendant still maintained he did not commit the offense but extended his condolences to the Scott family and said that he missed the victim, too.

On cross-examination, Defendant denied that he used the victim's bank card at Nipper's Corner on Sunday, October 16. Defendant explained that the card suddenly appeared in his car that Sunday morning but said that he used the bank card at a bank in Brentwood, not Nipper's Corner. Defendant insisted that the victim had more than one bank card.

Harding Scott, an officer with the Spring Hill Police Department, testified that he was called to a parking lot about a year before the trial when a locksmith had unlocked a car and found a letter written by Defendant to Danny Bryan. After reading a portion of the letter, Officer Scott turned it over to the authorities because the contents had relevance to Defendant's case.

In the first part of the letter, Defendant wrote that a few days before she disappeared, someone went into the victim's apartment while she was out and cut out the crotches from the victim's panties and the part of her bras that covered the nipples. Defendant included a drawing of a pair of panties and a bra illustrating how the cuts were made. The perpetrator then spread the underwear over the victim's bed so she would find the garments when she returned home. Defendant said that the victim told him about the incident on Tuesday, October 11. Defendant wrote that he received a letter from Shannon saying that his wife's underwear had been cut in the same way.

9

In the second part of the letter, Defendant wrote that he had sent Shannon a code to use when corresponding with him. Instead, Defendant said that he received a letter from a stranger written in the same code. Defendant translated the coded letter for Danny.

The stranger thanked Defendant for the code and wrote, "I cannot tell you who I am but I can tell you I killed the old bitch Lottie, sorry you got arrested." The stranger said that he struck the victim on the head and threw her from the third floor breeze way in front of her apartment. The letter continues, "[s]he made a loud pop when she hit. It was beautiful. . . . She stayed alive for awhile, she reached up [and] called Rick a few times. I finally jumped on her chest a few times. There was blood everywhere, it was pretty. German titty cake is good. . . . Would you believe, I ran over her a few times in the parking lot as a woman about 35 - 40 sat on the steps [and] watched . . . ."

Defendant said that he wrote the letter about a year prior to his third trial because his brother was investigating his case and he wanted Danny to know the truth. Defendant agreed that it appeared from the letter that the writer enjoyed committing the offense against the victim.

Gladys Talley, Defendant's grandmother, testified that Defendant had been a good child and was well-liked. She said that Defendant always took care of Shannon and Kimberly and was a good worker. Ms. Talley said that she knew the victim and had accompanied Defendant and the victim on outings. She stated that Defendant could not have been the one who killed the victim.

Based on the evidence presented at the sentencing hearing, the jury found that the state had proven one statutory aggravating circumstance beyond a reasonable doubt; that is, the offense was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. The jury found that the aggravating circumstance outweighed any mitigating circumstances and sentenced Defendant to life imprisonment without the possibility of parole.

## III. Sufficiency of the Evidence

Defendant argues first that his conviction rests solely upon circumstantial evidence, and that evidence is insufficient to support a finding that Defendant was the perpetrator of this offense.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547

(Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Although the evidence of Defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). The circumstantial evidence, however, must be not only consistent with the guilt of the accused but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypotheses except that of guilt. *Tharpe*, 726 S.W.2d at 900. In addition, "'it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" *Id.* (quoting *Pruitt v. State*, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

As Defendant points out, there was no physical evidence connecting him to the victim's death despite the fact that Defendant's home and automobile were searched a number of times. Defendant, however, admitted that he was with the victim on Wednesday, October 12, and talked to the victim by telephone on Saturday, October 15. Defendant also admitted in his second statement to the police that he used the victim's bank card on Sunday, October 16. Although Defendant later testified that Detective Miller made him write that part of his statement, his daughter, Kimberly, said that she and Defendant stopped at the ATM at Nipper's Corner on Sunday, and Defendant attempted to withdraw some money. Bank records indicate that a total of eight inquiries were made within a two-minute period at the Nipper's Corner ATM on October 16. The two requests for cash were denied because of insufficient funds in the victim's account, and the last transaction was an inquiry as to the account's balance.

It was Defendant who initially focused the police's attention to the rock quarry located between Sam Ridley Parkway and Interstate 24 where the victim's body was eventually found. On November 6, he told his brother, Danny, that he had buried the victim in that location. He and the victim had been to the quarry one evening. Defendant left the victim alone for awhile, and when he returned the victim was dead. Defendant later testified that he was at the rock quarry with the victim on Wednesday, October 12, and that he and the victim had visited that spot three other times during their relationship. Defendant also said that he returned to the quarry on Thursday or Friday looking for a place to camp.

On November 14, Defendant and his son, Shannon, drove to the cleared area behind LaVergne High School near the rock quarry with a blanket and a piece of plastic to look for the victim although Defendant later said that he did not expect to find her. He explained that he and Shannon were looking for the body of a man that night who was buried at the rock quarry.

On November 15, Mr. Thompson testified that Defendant drew a map showing the location of a shovel and a rake which he had left behind after searching for the victim. The map noted the

11

location of Sam Ridley Parkway and LaVergne High School with the location of the shovel and rake marked approximately fifteen feet from the access road leading to the rock quarry. Defendant also described the site as littered with debris and old mattresses. Mr. Thompson immediately described the spot to the police, and the victim's body was shortly found in a debris-filled pit.

Defendant contends that the evidence tying him to the victim's disappearance is, at best, weak and does not exclusively point to Defendant as the perpetrator of the offense. He argues that in order to find the circumstances conclusive as to Defendant's guilt, the jury had to ignore Defendant's own testimony wherein he denied using the victim's bank card on the weekend of her disappearance and denied that he killed the victim. Defendant's argument, however, goes to the credibility of the testimony. The jury decides the weight to be given circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958); *see also Gregory*, 862 S.W.2d at 577; *State v. Coury*, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985); *Pruitt*, 460 S.W.2d at 391.

When viewing the totality of this evidence in a light most favorable to the State, a rational jury, based on the evidence presented, could have found that Defendant was responsible for the death of the victim beyond a reasonable doubt.

Defendant next argues that the evidence was insufficient to show that he acted with premeditation and deliberation in the commission of the offense, and the evidence, therefore, only supports a conviction of second degree murder. Defendant points out that there were no witnesses to the killing or the events leading up to and following the commission of the crime. Relying on our supreme court's decision in *State v. West*, 844 S.W.2d 144 (Tenn. 1992), Defendant contends that while the State's depiction of the manner in which the victim died may well be true, it is just a theory without any supporting evidence. *Id.* at 148.

At the time of the offense, first degree murder was defined as the "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991). The terms "premeditated" and "deliberate" are not synonymous. *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992). A "deliberate act" is one performed "with a cool purpose." Tenn. Code Ann. § 39-13-201(b)(1). A "premeditated act," on the other hand, is performed "after the exercise of reflection and judgment." *Id.* -201(b)(2). "[P]remeditation requires proof of a previous intent to kill, while deliberation requires proof of a 'cool purpose' that includes some period of reflection during which the mind is free from passion and excitement." *State v. Bush*, 942 S.W.2d 489, 501 (Tenn. 1997), citing *Brown*, 836 S.W.2d at 539.

Whether the defendant acted with premeditation and deliberation may be established by circumstantial evidence. *Brown*, 836 S.W.2d at 541. If there is no direct evidence as to the defendant's state of mind before, during and after the killing, the elements of premeditation and deliberation may be inferred from the circumstances surrounding the offense. *State v. Schafer*, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997). As with direct evidence, the weight accorded

12

circumstantial evidence and the inferences drawn from such evidence are factors left primarily to the jury. *Marable*, 313 S.W.2d at 457. "However, circumstantial evidence of a defendant's state of mind will not support a jury verdict of premeditated murder unless the proof of premeditation and deliberation is 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" *Schafer*, 973 S.W.2d at 273, quoting *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971).

Factors which may support the existence of a premeditated and deliberate killing include the defendant's prior relationship with the victim, the nature or particular cruelty of the killing, the use of a deadly weapon on an unarmed victim, the infliction of multiple wounds, the destruction or secretion of evidence, and the defendant's calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *Bland*, 958 S.W.2d at 660; *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993); *see also Bush*, 942 S.W.2d at 502 (Evidence that the defendant first hit the victim with a board and then retrieved a second weapon with which he continued the attack is probative of premeditation.)

In *West*, the victim and the defendant encountered each other on their tractors. The defendant testified that the victim insulted and threatened him. The defendant went home briefly, and when he came back, the victim attacked him with an iron bar. The defendant then shot the victim. *West*, 844 S.W.2d at 146-47. As proof of premeditation, the State offered its theory that the defendant had returned home for the express purpose of retrieving his gun so that he could kill the victim. *Id.* at 148. The defendant, on the other hand, contended that he had his gun with him all morning. *Id.* The supreme court concluded that "[w]hile the state's theory may be true, it remains only a theory, because the prosecution has no evidence to support it." *Id.* "Although the jury is permitted to disbelieve the defendant's testimony, it may not construct a theory based on no evidence at all." *Id.*

Unlike the lack of evidence in *West*, however, the evidence presented in the case *sub judice* was consistent with the State's argument concerning the manner in which the victim was killed. Defendant testified that he and the victim had a long-standing relationship of several years but that the relationship had cooled in the months immediately preceding the victim's death. Defendant said that he met the victim at the rock quarry shortly before she disappeared in an area near the place where the body was eventually found. This spot was familiar to the victim because she and Defendant had visited the quarry three previous times.

No blood, tissue or other physical evidence was discovered in the victim's apartment, Defendant's residence, or his car indicating that the victim was killed at or near the rock quarry where she was buried. Medical testimony showed that the victim first suffered four blows to the head of sufficient force to render her unconscious, and both arms were broken. There were no defense wounds, indicating that the victim was either surprised or unable to defend herself. The victim's death, however, was caused by a massive blunt force trauma to her chest which fractured her ribs in forty-four places. The medical evidence was consistent with the State's theory that Defendant knocked the victim unconscious, got into his vehicle and ran over the victim. These circumstances indicate that Defendant acted with cool purpose and with ample time for reflection.

13

Moreover, after the victim died, she was stabbed multiple times and both breasts were completely amputated. Finally, the victim was buried in a remote area in a pit eight to ten feet below ground level and the body covered with six to nine inches of dirt as well as various kinds of debris.

Considering the proof in the light most favorable to the state, a rational jury could have concluded, based on the facts presented to it, that Defendant, acting with cool purpose and without passion or provocation, consciously engaged in conduct that led to the victim's death. Therefore, we conclude that the evidence in this record is sufficient to establish premeditation and deliberation. Moreover, this Court has previously concluded that the jury could have found that Defendant acted with premeditation and deliberation in the killing of the victim based on essentially the same evidence. *See State v. Bryan*, 990 S.W.2d 231, 241 (Tenn. Crim. App. 1998).

## IV. Aggravating Circumstances

At the conclusion of Defendant's sentencing hearing, the jury found that the State had proven beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). The jury further found that the aggravating circumstance outweighed any mitigating circumstances and sentenced Defendant to life imprisonment without parole.

As he points out in his brief, Defendant failed to raise this sentencing issue in his motion for new trial as required by Rule 3(e) of the Tennessee Rules of Appellate Procedure. Ordinarily, Defendant's failure to do so would constitute a waiver of the issue. Tenn. R. App. P. 3(e). Nonetheless, we find the record sufficient to address the merits of Defendant's issue.

Defendant argues that the evidence is insufficient to support a finding that the victim was either tortured or suffered serious physical abuse prior to her death. Defendant contends that the victim was either unconscious at the time she was run over or she suffered the lacerations and broken arms at the same time as the fatal chest injuries. As a result, Defendant submits that the jury could not reasonably conclude that the victim was tortured prior to her death. Defendant also argues that the evidence does not support a finding that the victim suffered serious physical abuse because he contends that postmortem injuries may not be considered in determining whether there was "serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5).

The State has the burden of proving beyond a reasonable doubt that a statutory aggravating circumstance exists. Tenn. Code Ann. § 39-13-204(i). In determining whether the evidence supporting the existence of an aggravating circumstance is sufficient, "the proper inquiry for the appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. Carpenter*, 69 S.W.3d 568, 574 (Tenn. Crim. App. 2001), citing *State v. Suttles*, 30 S.W.3d 252, 262 (Tenn. 2000).

14

In establishing that a killing is especially heinous, atrocious or cruel, the State may prove either torture or serious physical abuse. *State v. Keen*, 31 S.W.3d 196, 206 (Tenn. 2000), citing *State v. Hall*, 8 S.W.3d 593, 601 (Tenn. 2000). "Torture" contemplates "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Keen*, 31 S.W.3d at 206, quoting *State v. Morris*, 24 S.W.3d 788, 797 (Tenn. 2000).

A review of Dr. Harlan's testimony reveals that while the initial blows to the victim's head could have rendered her unconscious, the evidence is inconclusive as to the victim's state of consciousness when she was run over by Defendant's car. Regardless of whether the proof supports the existence of torture, however, the evidence is sufficient to find that the murder involved "serious physical abuse beyond that necessary to produce death."

"Serious physical abuse" is distinguishable from torture. *State v. Odom*, 928 S.W.2d 18, 26 (Tenn. 1996).

The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use.

*Id.*

In his contention that the victim did not suffer serious physical abuse, Defendant apparently ignores the injuries inflicted upon the victim prior to her death. We conclude, however, that the act of running over a seventy-two year old woman, who has been immobilized by four blows to the head, with an automobile supports a finding that the victim suffered excessive abuse beyond that which was necessary to cause her death. *See State v. Howell*, 34 S.W.3d 484, 511 (Tenn. Crim. App. 2000) (Running victim over with a car when she was most likely alive supports a finding that the murder was especially heinous, atrocious, and cruel).

In addition, the victim was stabbed multiple times in the abdomen and thighs and both breasts were amputated after her death. This Court has previously rejected Defendant's argument that post-death injuries cannot be considered in determining whether the killing was especially heinous, atrocious or cruel because it involved serious physical abuse. *State v. Cedric Dickerson*, No.02C01-9802-CR-00051, 1999 WL 74213, *4 (Tenn. Crim. App., Jackson, Feb. 17, 1999), *perm. to appeal denied* (Tenn. 2001). Although the legislature added the mutilation of a body after death as an aggravating circumstance in 1995, the *Odom* court specifically declined to limit "serious physical abuse" to abuse inflicted before death. *Id.*, citing *Odom*, 928 S.W.2d at 25, n. 5.

Based on the proof in this case, including both the pre-death and post-death injuries, and viewed in the light most favorable to the State, we find the evidence sufficient to support the jury's finding beyond a reasonable doubt that the murder was heinous, atrocious, or cruel in that it involved

serious physical abuse beyond that necessary to produce death, and the sentence of life imprisonment without the possibility of parole was not otherwise imposed arbitrarily.

## CONCLUSION

For the reasons set forth above, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE